

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00066-CR

**EX PARTE** Patricia Foster **SKELTON**

From the 38th Judicial District Court, Real County, Texas
Trial Court No. 2011-2993-DC
Honorable Camile G. Dubose, Judge Presiding

### OPINION ON REHEARING

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Karen Angelini, Justice
               Rebeca C. Martinez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed: May 28, 2014

MOTION FOR REHEARING GRANTED; REVERSED; HABEAS CORPUS RELIEF
GRANTED

On July 10, 2013, we issued an opinion and judgment affirming the trial court's order

denying Patricia Foster Skelton habeas relief from her conviction for forgery. After Skelton timely

filed a motion for rehearing, we invited the State to file a response, which it did not do. We grant

Skelton's motion because we conclude we did not fully address one of the grounds supporting her

ineffective assistance of counsel claims on original submission. We therefore withdraw our

opinion and judgment of July 10, 2013, and issue this opinion and judgment in their place.

Skelton appeals from the habeas court's order denying her application for habeas relief as

frivolous. She applied for habeas relief on three grounds, claiming that she is actually innocent,

she was denied a fair trial due to prosecutorial misconduct, and she received ineffective assistance of counsel. We now hold Skelton proved by a preponderance of the evidence that her trial counsel performed below an objective standard of reasonable representation and his deficient performance prejudiced her defense. Therefore, we reverse the trial court's order, grant relief, and vacate Skelton's conviction and sentence so that she may receive a constitutionally fair trial.

## BACKGROUND

Skelton was convicted by a jury of forging the will of a deceased client, Ysidro Canales. The investigation into Skelton began after Canales died and his nephew asked Skelton to file his will with the court. Skelton's paralegal suspected that the will filed by Skelton was forged, and she reported her suspicions to the Real County Sheriff. The sheriff asked Texas Ranger Coy Smith to lead the investigation of Skelton because she had previously served as the county attorney of Real County. Ranger Smith secured a search warrant for Skelton's office and led the search. This was when Skelton first became aware that she was being investigated.

A person commits the offense of forgery if she forges a writing with intent to defraud or harm another. TEX. PENAL CODE ANN. § 32.21(b) (West 2011). The State alleged Skelton committed the act of forgery by altering a writing so it purported to be an act of Canales, who did not authorize the act. *See id.* § 32.21(a)(1)(A)(i). At trial, the prosecution and the defense agreed that Skelton had literally cut and pasted the signatures of Canales and two witnesses onto a writing purporting to be a will executed by Canales. She then photocopied the altered document and filed that copy with the court. She did not inform the court that neither Canales nor the witnesses ever signed that particular document. The primary point of contention at trial was whether Skelton had acted "with the intent to harm or defraud."[1]

---

[1] "Defraud" is not defined in the Texas Penal Code, but one judge on the Court of Criminal Appeals has reasoned that "defraud," as used in the phrase "intent to harm or defraud," should be understood as a particular way of causing

The prosecution contended that Skelton fabricated the terms of the will out of whole cloth to the benefit of Canales's nephew, who was the main beneficiary of the will filed by Skelton. One of the motives alleged by the prosecution was that Skelton was afraid Canales's nephew would sue her for malpractice if she could not produce Canales's will. To support its theory of the case, the prosecution presented evidence that suggested neither Skelton nor Canales could have met in her office in Leakey, Real County, Texas, to execute a will on the date stated on the filed copy. The prosecution presented evidence that Skelton attended a hearing in Kerrville, Kerr County, Texas, on the morning of the alleged date of the will's execution. And two of Canales's relatives, who would receive a larger share of Canales's estate if he had died intestate than under the terms of the filed will, testified that Canales was on his way to gamble in Louisiana with his sister that afternoon. The prosecution contended that Skelton's act in filing the purported will was circumstantial evidence that she altered the filed will with the intent to harm or defraud the court and Canales's relatives who would have received a larger share of Canales's estate, had he died intestate.

The defense contended that the will filed by Skelton accurately represented a will actually executed by Canales. Skelton testified the document she created was a computer printout of a will that Canales validly executed while he was still alive. She testified Canales kept the original will, which was never produced, and that after Canales died, she located the signed copy of the will she kept in her office. Skelton testified the signed copy was severely water damaged from a flood her office suffered the year before, rendering parts of it legible and others not. She had cut out signatures from the signed copy of Canales's will and pasted them onto a new copy of the will, and admitted she did not inform the court of what she had done. She testified she did not know she

---

"harm." *Margraves v. State*, 34 S.W.3d 912, 923 (Tex. Crim. App. 2000) (Johnson, J., concurring), *abrogated on other grounds by Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009).

could probate an unsigned copy of his will. Both of the witnesses whose signatures Skelton attached to the filed will testified that they had witnessed Canales execute a will on the date stated. Under the defense's theory of the case, Skelton did not act with the intent to harm or defraud anyone because the will she filed completely and accurately represented Canales's intentions.

Skelton was convicted, sentenced to a suspended one-year term of imprisonment, and placed on community supervision for two years. Her term of community supervision was stayed pending the disposition of her direct appeal. She appealed her conviction to this court, and we affirmed the judgment. *Skelton v. State*, No. 04-08-00720-CR, 2010 WL 2298859 (Tex. App.—San Antonio June 9, 2010, pet. ref'd) (mem. op., not designated for publication). Skelton's term of community supervision began to run after the issuance of our mandate.

During the State's investigation of Skelton, some of Canales's relatives contested Canales's purported will.[2] That court stayed the will contest until Skelton's criminal trial was completed. After Skelton's conviction, the probate case resumed, and the fact of Skelton's forgery conviction was entered into evidence. The civil jury found (1) that Canales executed a valid will, (2) that Skelton did not forge the will she filed with the court, and (3) that the probated will was an accurate copy of Canales's will. The jury question that specifically asked whether Skelton had forged the will offered for probate used the Texas Penal Code's definition of forgery and other relevant terms.

While on community supervision, Skelton applied for a writ of habeas corpus under article 11.072 of the Texas Code of Criminal Procedure and requested an evidentiary hearing.[3] *See* TEX.

---

[2] The civil proceeding was cause number 09-02-19336-CV, styled *In the Estate of Ysidro A. Canales, Deceased*, in the 38th Judicial District Court of Medina County, Texas, the Honorable Stephen Ables presiding. The record of the proceeding was attached as part of Skelton's habeas application.

[3] We note that the judge who presided over Skelton's trial, the Honorable Henry G. Schuble, passed away before Skelton filed her habeas application.

CODE CRIM. PROC. ANN. art. 11.072 (West Supp. 2013) (establishing procedure for habeas application seeking relief from order or judgment ordering community supervision). The habeas court did not hold a hearing, determined from the face of the application that Skelton was manifestly not entitled to relief, and denied Skelton's application as frivolous without making written findings of fact or conclusions of law. On appeal, Skelton initially asked this court to reverse the habeas court's order, or in the alternative, to remand the case for an evidentiary hearing on her habeas application. We abated the appeal and remanded the case to the habeas court to conduct an evidentiary hearing and to make written findings of fact and conclusions of law with respect to Skelton's ineffective-assistance-of-counsel claim. The parties have filed supplemental briefs based on the record of the hearing and the habeas court's findings of fact and conclusions of law.

## STANDARD OF REVIEW

The habeas court may dispose of an application for habeas corpus under article 11.072 of the Texas Code of Criminal Procedure in two ways. The court shall deny an application as frivolous "[i]f the court determines from the face of an application or documents attached to the application that the applicant is manifestly entitled to no relief." TEX. CODE CRIM. PROC. ANN. art. 11.072, § 7(a). In all other cases, the court must make written findings of fact and conclusions of law when granting or denying relief. *Id.*

We review de novo the habeas court's determination that an application is frivolous on its face and that the applicant is manifestly not entitled to relief. *Ex parte Zantos-Cuebas*, No. 01-13-00958-CR, 2014 WL 715057, at *4 (Tex. App.—Houston [1st Dist.] Feb. 25, 2014, no pet.). However, when the habeas court has made written findings and conclusions in support of its order, we review the court's order for an abuse of discretion. *Ex parte Garcia*, 353 S.W.3d 785, 787–88 (Tex. Crim. App. 2011) (adopting the abuse-of-discretion standard articulated in *Guzman v. State*,

955 S.W.2d 85 (1997) for appellate review of article 11.072 habeas proceedings). The habeas court is the sole finder of fact in an article 11.072 habeas proceeding, and we afford almost total deference to its determinations of historical fact that are supported by the record, especially when those findings rely on evaluations of witnesses' credibility and demeanor. *Id.*; *Ex parte Urquhart*, 170 S.W.3d 280, 283 (Tex. App.—El Paso 2005, no pet.). The trial court's application of the law to the facts is accorded the same deference if it turns on points of evidence related to credibility and demeanor. *Urquhart*, 170 S.W.3d at 283; *see Guzman*, 955 S.W.2d at 89. But if the resolution of those ultimate questions turns only on the application of legal standards, the trial court is not in an appreciably better position than an appellate court to make that determination, and we review de novo. *Ex parte Mello*, 355 S.W.3d 827, 832 (Tex. App.—Fort Worth 2011, pet. ref'd); *Urquhart*, 170 S.W.3d at 283; *see Guzman*, 955 S.W.2d at 89.

### INEFFECTIVE ASSISTANCE OF COUNSEL[4]

To determine whether the representation provided by Skelton's counsel was so inadequate as to violate her Sixth Amendment right to counsel, we apply the United States Supreme Court's two-pronged *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Under the *Strickland* test, Skelton must show by a preponderance of the evidence that her counsel's performance was deficient and that his deficient performance prejudiced her defense. *Ex parte Nailor*, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004); *Thompson*, 9 S.W.3d at 812. Ineffective-assistance-of-counsel claims are analyzed under the "totality of the representation" standard. *Ex parte Nailor*, 149 S.W.3d at 130. In other words, we "analyze all allegations of deficient performance, decide whether counsel's conduct

---

[4] Skelton raised an ineffective-assistance-of-counsel claim in her direct appeal, which this court overruled because the record was not sufficiently developed. "Unlike other claims rejected on direct appeal, claims of ineffective assistance of counsel rejected due to lack of adequate information may be reconsidered on an application for a writ of habeas corpus." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

was constitutionally deficient, and, if so, then consider whether those specific deficient acts or omissions, in their totality, prejudiced the defense." *Id.*

Skelton argues her counsel was ineffective because he:

a) did not object when the State enlarged its theory of the case beyond the indictment;

b) did not object when the State elicited testimony about Skelton's invocation of her right to silence and her right to counsel after she was informed of her *Miranda* rights and he emphasized that testimony on cross-examination;

c) did not object when the State presented Ranger Smith as an expert on the law of forgery and he testified she was guilty of forgery;

d) did not object when the State elicited hearsay testimony to bolster a witness's credibility; and

e) did not object when the State made improper jury arguments.

In its written findings of fact, the habeas court found Skelton's trial counsel had been practicing law for over thirty years, had served as an elected District Attorney, and "was a witness of the highest degree of credibility and truthfulness." The court further found her counsel "explained valid and compelling strategic reasons for all of the acts and omissions that form the basis for the applicant's post-probation writ of habeas corpus" and that "those rationales are valid and within the range of acceptable strategic decisions required of trial counsel." Finally, the court concluded that even if any of her counsel's acts or omissions could be considered deficient, Skelton had not demonstrated prejudice.[5]

### Deficient Performance

To meet the first prong of the *Strickland* test, Skelton must prove by a preponderance of the evidence that her counsel's representation was "deficient"—*i.e.*, that it fell below an objective

---

[5] In its appellate briefing, the State did not argue the merits of any of Skelton's claims. Its briefing on Skelton's ineffectiveness claim, both before and after we abated the case for an evidentiary hearing, merely recites the law defining such claims, quotes the habeas court's findings, and asserts that Skelton has not shown the court abused its discretion.

standard of reasonableness based on prevailing professional norms and the circumstances of her case. *Strickland*, 466 U.S. at 690; *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011). The majority of Skelton's complaints regarding her trial counsel's performance contend that he was ineffective for failing to object to inadmissible evidence or improper argument. Therefore, she must show that the trial court would have committed error in overruling such an objection. *Ex parte Martinez*, 330 S.W.3d at 901. To avoid the deleterious effects of hindsight, we begin with the strong presumption that her counsel's trial performance fell within the wide range of reasonable professional assistance. *Nailor*, 149 S.W.3d at 130; *Thompson*, 9 S.W.3d at 813.

At the habeas hearing, Skelton's counsel repeatedly testified that his overall trial strategy was to convince the jury that Skelton had accurately reproduced the terms of an actual will executed by Canales and thus did not have the intent to harm or defraud required by the forgery statute. Part of his strategy was to show that Skelton had been open and cooperative with law enforcement during the investigation. He testified about all the acts or omissions of which Skelton complains in her ineffectiveness claim.

### a) *Expanding the Prosecution's Theory of Criminal Liability beyond the Indictment*

Skelton first contends her counsel was ineffective because he failed to object when the State enlarged its theory of the case beyond the indictment's charge of forgery by alteration to include forgery by passing. Forgery may, *inter alia*, be committed by "altering" a writing or by "passing" a forged writing. TEX. PENAL CODE ANN. §§ 32.21(a)(1)(A), (B). In her direct appeal, Skelton argued the State "constructively amended" the indictment when it "enlarged the theory of guilt through [its] counsel's opening statement and closing argument to the jury and witness testimony." *Skelton*, 2010 WL 2298859, at *2. We held there was no "constructive amendment," and thus no error. *Id.* Skelton may not use the writ of habeas corpus to relitigate an issue that was decided adversely to her on direct appeal. *See Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim.

App. 1994). Because the State's actions were not erroneous, the trial court would not have abused its discretion in denying an objection, and Skelton's counsel was not ineffective for not objecting.

### b) *Invocation of Skelton's Right to Counsel and Right to Silence*

Skelton's second complaint argues her counsel was ineffective because he did not object when the State elicited testimony from Ranger Smith that Skelton invoked her rights to counsel and remain silent after he had informed her of her *Miranda* rights. She also contends her counsel was ineffective for revisiting and emphasizing that testimony while cross-examining Ranger Smith.

 "The guaranty of fundamental fairness in the Due Process Clause forbids the government from making the *Miranda* promises and breaking them by using a suspect's exercise of a right as evidence against him." *Griffith v. State*, 55 S.W.3d 598, 605 (Tex. Crim. App. 2001) (citing *Doyle v. Ohio*, 426 U.S. 610 (1976)); *see also Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) ("What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized."). Thus, if a defendant is given the *Miranda* warnings and she subsequently invokes her right to counsel or to remain silent, the State cannot use the defendant's invocation of her rights as evidence against her at trial. *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991); *Kalisz v. State*, 32 S.W.3d 718, 723 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *Gray v. State*, 986 S.W.2d 814, 815 (Tex. App.—Beaumont 1999, no pet.); *Loy v. State*, 982 S.W.2d 616, 617 (Tex. App.—Houston [1st Dist.] 1998, pet ref'd); *Cooper v. State*, 961 S.W.2d 222, 226–27 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd); *see also Wainwright*, 474 U.S. at 295 & n.13.

This kind of due-process violation is prejudicial to a defendant because the introduction of such evidence invites the jury to draw an adverse inference of guilt from the exercise of a constitutional right. *Hardie*, 807 S.W.2d at 322; *Kalisz*, 32 S.W.3d at 723. Stated another way, the

probable collateral implication of a defendant's invocation of her rights is that she is guilty. *Gray*, 986 S.W.2d at 815; *Loy*, 982 S.W.2d at 618; *Cooper*, 961 S.W.2d at 227. The Fifth Circuit has explained that such testimony is particularly damaging in cases where the defendant intends to offer an exculpatory story at trial:

> [T]he substantive use of a defendant's invocation of counsel or silence before the defendant has the opportunity to offer her exculpatory story places her in an untenable position. "If she does not take the stand, an inference of guilt by the jury is a possible inference; if she does take the stand, her credibility will already be in question and the jury might simply discount as fabricated a story the defendant neglected to tell the police on the scene."

*United States v. Moreno*, 185 F.3d 465, 473 (5th Circ. 1999) (internal alterations omitted) (quoting *Chapman v. United States*, 547 F.2d 1240, 1243 n.5 (5th Circ. 1977)).

Ranger Smith testified he investigated Skelton and oversaw the search of Skelton's office. He testified that, before he interviewed Skelton during the search of her office, Skelton signed a form that stated she was not under arrest and he read Skelton's constitutional rights to her. He testified that Skelton told him all parties whose signatures appeared on Canales's will were present when he signed the will in her office. Ranger Smith then testified that he was unable to continue interviewing Skelton because they were interrupted:

PROSECUTOR: And how were you interrupted?
RANGER SMITH: There was an attorney that came in by the name of Bob Galan or Galvan. I'm sorry but I have forgotten the name exactly. But he entered her office there where we were talking.
PROSECUTOR: Did the defendant ever re-approach you or call you to try to explain herself or tell you her side of the story after all of that?
RANGER SMITH: No, ma'am.
PROSECUTOR: Did you ever try to re-approach her or call her back?
RANGER SMITH: I wasn't permitted to do that.
PROSECUTOR: Why weren't you permitted to do that?
RANGER SMITH: The attorney and her invoked her right not to talk to me anymore, and invoked her right that Mr. Galvan—

- 10 -

> PROSECUTOR: In your training and experience that's the law, that if someone invokes their right to a lawyer that you cannot re-approach them or they cannot re-approach you?
> RANGER SMITH: Yes, that's correct.
> PROSECUTOR: So you didn't go back to them?
> RANGER SMITH: That's correct.
> PROSECUTOR: So you followed that law?
> RANGER SMITH: That's correct.

The record shows that the prosecution deliberately elicited testimony from Ranger Smith that Skelton invoked her constitutional rights to terminate the interview. This line of questioning violated Skelton's right to due process, and had an objection been made, the trial court would have been required to sustain it on that ground.[6] *See Hardie*, 807 S.W.2d at 322.

At the habeas hearing, Skelton's counsel agreed that a defendant's invocation of her rights is not admissible before a jury because of the danger that a jury may infer guilt from the invocation of those rights. He testified that he went to trial under the impression that Skelton had been cooperative during the search and that fact would be a fact in the defense's favor. He then offered several inconsistent explanations as to why he chose not to object to the line of questioning about the invocation of Skelton's rights. He testified that the main reason he chose not to object was because he intended to call Skelton to testify and he thought some of the facts about which the prosecution was asking would have come out then. He also testified that he thought Ranger Smith's

---

[6] On her own initiative, Skelton briefed the issue of whether her counsel may have "opened the door" to Ranger Smith's testimony. In his opening statement, her counsel said "[n]ow when the law enforcement became involved in this case they did not go to Patty Skelton and interview her or ask her what happened." Skelton argues that this statement did not open the door for the prosecution to elicit testimony about her invocation of her rights on direct examination. We agree. Although "otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered 'opens the door' . . . the party offering the evidence may not 'stray beyond the scope of the invitation.'" *Schutz v. State*, 957 S.W.2d 52, 71 (Tex. Crim. App. 1997) (quoting *Bush v. State*, 773 S.W.2d 297, 301 (Tex. Crim. App. 1989)). The opening statement questioned the State's investigation of Skelton because the investigators did not speak to her when they first became involved in the case. Any possible misleading impression that the State's investigators *never* spoke with Skelton was dispelled by the prosecution's questioning of Ranger Smith and did not require the prosecution to elicit specific evidence that Skelton terminated the interview by invoking her rights. *Cf. Wainwright*, 474 U.S. at 295 ("[T]he State's legitimate interest in proving that the defendant's behavior appeared to be rational at the time of his arrest could have been served by carefully framed questions that avoided any mention of the defendant's exercise of his constitutional rights to remain silent and to consult counsel.").

testimony showed that Skelton was open and cooperative with Ranger Smith, and that he did not consider it "too harmful with the jury when a new lawyer comes up and says, okay, that's enough, shut up." He also testified that he did not want to emphasize that portion of Ranger Smith's testimony to the jury by objecting. Although we accord great deference to counsel's strategic decisions, we conclude that there was no strategic value to justify not objecting to testimony specifically discussing Skelton's invocation of her rights.

Counsel's claim that he did not think evidence that Skelton invoked her rights to terminate an interview with Ranger Smith would be harmful to the jury contradicts his own testimony acknowledging that such testimony is harmful. And more importantly, his belief was objectively unreasonable because it is inconsistent with well-established case law that the reason such testimony is inadmissible is precisely because the jury may draw an adverse inference of guilt from the invocation of her rights. *See Hardie*, 807 S.W.2d at 322. For comparison, this court considered in *Walker v. State* whether counsel's failure to request a required jury instruction in the punishment phase of a defendant's trial supported an ineffective-assistance-of-counsel claim. 195 S.W.3d 250, 262 (Tex. App.—San Antonio 2006, no pet.). Because the prosecution introduced evidence that the defendant had committed unadjudicated offenses in the punishment phase, the trial court was required to submit a charge instructing the jury not to consider the extraneous offenses unless it found the defendant had committed them beyond a reasonable doubt. *Id.* (citing *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000)). At the motion for new trial, the defendant's counsel testified that he did not ask for the required instruction because he did not want the jury to think the defendant was hiding something and because he presumed the jury would not believe the defendant committed an extraneous offense simply because he was arrested for it. *Id.* Because the reasonable-doubt instruction is required precisely because a jury might consider such evidence in assessing punishment without proof beyond a reasonable doubt, we held counsel's explanation did

not justify his lack of objection. *Id.* Following *Walker*'s reasoning, we hold that Skelton's counsel's belief that Ranger Smith's testimony would not be harmful to Skelton—in contravention of well-established case law—was not objectively reasonable.

Her counsel also should have been aware that the prosecution's line of questioning would be damaging because he intended to have her testify about her exculpatory story. When the prosecution elicited Ranger Smith's testimony, Skelton's credibility was damaged by the implication that she invoked her rights to terminate questioning until she could flesh out or fabricate her exculpatory story. *See Moreno*, 185 F.3d at 473. The credibility of Skelton's story was therefore damaged before she even had a chance to offer it. *Id.*

Counsel's claim that his lack of objection was strategic is also undercut by his own repeated testimony that Skelton's credibility with the jury was essential to her defense. His defensive strategy to establish her credibility was that she did not act with the intent to harm or defraud and that she cooperated with the State's investigation because she had nothing to hide. The substance of Ranger Smith's testimony that Skelton invoked her rights to terminate the interview was directly contrary to counsel's overall trial strategy. *Cf. Mares v. State*, 52 S.W.3d 886, 892–93 (Tex. App.—San Antonio 2001, pet. ref'd) (holding counsel could have no strategic basis for not objecting to a probation officer's "expert" testimony that counsel's client was not a good candidate for probation when counsel's sole strategy was to obtain a probated sentence). Where a defendant's credibility is central to her defensive strategy, it is not sound trial strategy to allow the introduction of inadmissible evidence that directly impairs the defendant's credibility without objection. *See Robertson v. State*, 187 S.W.3d 475, 484 (Tex. Crim. App. 2006); *Ex parte Menchaca*, 854 S.W.2d 128, 132–33 (Tex. Crim. App. 1993); *Garcia v. State*, 308 S.W.3d 62, 68–69 (Tex. App.—San Antonio 2009, no pet.); *Stone v. State*, 17 S.W.3d 348, 353 (Tex. App.—Corpus Christi 2000, pet. ref'd); *see, e.g., Ex parte Crews*, No. WR-76,141-01, 2014 WL 969964, at *4 (Tex. Crim. App.

March 12, 2014) (not designated for publication); *cf. Fuller v. State*, 224 S.W.3d 823, 836 (Tex. App.—Texarkana 2007, no pet.) (holding that defense counsel's lack of objection to prosecution's repeated introduction of inadmissible evidence to bolster the complainant's credibility could not be sound trial strategy).

In addition, counsel's assertion that Skelton would testify to similar facts as Ranger Smith does not justify his lack of objection. At the habeas hearing, counsel acknowledged that he went to trial under the impression that Skelton had been cooperative with Ranger Smith and was not aware that the prosecution intended to introduce evidence that Skelton had invoked her rights. Nowhere in the record does it indicate that counsel planned to elicit testimony from Skelton that she invoked her rights to terminate the interview or planned to have her affirmatively deny that she had invoked her rights prior to Ranger Smith's testimony. Absent a direct claim by Skelton that she never invoked her rights, the State could not use the invocation of her rights to impeach her on cross-examination. *See Doyle*, 426 U.S. at 619 (holding defendant's post-arrest, post-*Miranda* silence could not be used to impeach her exculpatory story simply because she chose to remain silent instead of offering her story at the time of her arrest).

Finally, although in some cases it may be sound trial strategy not to object to inadmissible evidence in order not to impress it upon the jury, *see, e.g., Haagensen v. State*, 346 S.W.3d 758, 766 (Tex. App.—Texarkana 2011, no pet.), counsel's actions on cross-examination belie any post-trial claim that he did not wish to emphasize this testimony.

On cross-examination, Skelton's counsel followed up on the prosecution's questions and had the following exchange with Ranger Smith:

> DEFENSE: Again, my reading of your offense report reflects that he was actually telling Patty to cooperate with you.
> RANGER SMITH: There was not any question that she was cooperating to some degree, as far as she presented the file. She had helped me find some other things too. I mean I wouldn't

call her uncooperative. It was just that whenever—I believe it also notes in the same report that it was clear that they both agreed that it was in her best interest to invoke her right to remain silent and not to say anything else, and that my questioning was to stop; that he was the legal counsel that represented her, and I know that to be true because in the days that followed I received a multitude of faxes and demands, just a whole multitude of pages of things from Mr. Galvan relating to Mrs. Skelton. So there wasn't any question to me that she had invoked her right and that he represented her, that he was her legal counsel. So that was the end of my conversation with her, and I had no legal right to discuss anything with her at that time.

DEFENSE: I did not see that in your report. Could you show me in the report where you indicated that he had invoked her rights?

RANGER SMITH: Well, it's on Page 2 of 11, which is report Number 3, Paragraph 3.3. I was instructed not to read from the report, but basically it—

DEFENSE: Let me just look at it.

RANGER SMITH: Excuse me?

DEFENSE: Let me just look at it. Just show me where to look.

RANGER SMITH: Right there.

DEFENSE: Okay. I have read that, but I don't see anywhere in that particular paragraph where there was any invocation of the Fifth Amendment rights. Do you?

RANGER SMITH: (No answer)

DEFENSE: He showed up and started talking about the search warrant, but I don't see anything in that paragraph there on that, other than him showing up. Maybe I'm wrong. I don't tend to be right all the time.

RANGER SMITH: Yes, sir, you are, because—Pardon me. I'm not trying to be rude or anything, but in the explanation—I mean I was there and I wrote the report, and it's clear to me that Mr. Galvan represented her, and that's exactly what this says, "He represented her in this investigation and no further questions were asked due to the fact she invoked her right to have an attorney present."

DEFENSE: Well, it's that last part, the "due to the—

RANGER SMITH: Well, again, I'm not trying to be rude here, but we have a play on words. I mean I just—There was not any doubt to me that she had invoked her right to counsel.

DEFENSE: That was your understanding?

RANGER SMITH: That was very clear to me, yes, sir.

Skelton's counsel clearly emphasized and highlighted Ranger Smith's earlier prejudicial testimony that Skelton invoked her rights, and his actions thus belie his claim that he deliberately chose not to object to Ranger Smith's earlier testimony in order to *not* emphasize it. *Cf. Crews*, 2014 WL 969964, at *4 (considering defense counsel's contradictory justifications and actions in holding that counsel was not acting pursuant to sound trial strategy).

Counsel's cross-examination is also another basis for Skelton's claim that her counsel was ineffective. Although the defense is not prohibited from introducing evidence that a defendant invoked her rights after being given the *Miranda* warnings, the same dangers apply to such evidence, and we must examine whether Skelton's counsel had a strategic basis for eliciting the testimony. *See Robertson*, 187 S.W.3d at 484 (holding trial counsel performed deficiently for introducing evidence that would have been inadmissible under Rule 404(b) if offered by the State). At the habeas hearing, Skelton's counsel testified that he explored the question of Skelton's invocation of her *Miranda* rights as part of his strategy of showing she was honest and open with investigators. We do not understand how counsel's emphasis of Ranger Smith's testimony that she invoked her rights could be part of a sound trial strategy. His cross-examination highlighted evidence that allowed the jury to draw an adverse inference of guilt; impeached Skelton's testimony before she even took the stand to offer her exculpatory story; and was directly contrary to his overall trial strategy of developing and preserving Skelton's credibility which was the crux of her defense. Far from being sound trial strategy, we conclude that counsel's emphasis of Ranger Smith's testimony was possibly more damaging than the prosecution's initial inquiry. *See Harding v. Sternes*, 380 F.3d 1034, 1045 (7th Cir. 2004).

In conclusion, the evidence elicited by the State and Skelton's own counsel was not only generally prejudicial to Skelton's defense, but also directly prejudicial to her defensive strategy at

trial. The inconsistent explanations that Skelton's counsel offered do not persuade us that he acted pursuant to an objectively reasonable trial strategy. We conclude counsel's failure to object to Ranger Smith's testimony that Skelton invoked her rights and his emphasis of that testimony on cross-examination support Skelton's claim that he performed below an objectively reasonable level of representation. *See Menchaca*, 854 S.W.2d at 132 ("'[T]o pass over the admission of prejudicial and clearly inadmissible evidence . . . has no strategic value.'") (quoting *Lyons v. McCotter*, 770 F.2d 529-534 (5th Cir. 1985)); *see also Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) ("[W]hen no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as [he] did.").

### c) The Texas Ranger's "Expert" Testimony and Opinion as to Skelton's Guilt

Skelton's third complaint is that her counsel allowed, without objection, Ranger Smith to testify as an expert witness about the requirements of the Penal Code definition of forgery and to offer an opinion as to her ultimate guilt or innocence.

No witness, expert or lay, is competent to voice an opinion about the guilt or innocence of a defendant. *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974); *see also Fairow v. State*, 943 S.W.2d 895, 899 (Tex. Crim. App. 1997); *DeLeon v. State*, 322 S.W.3d 375, 383 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). The jury alone weighs the guilt or innocence of the accused based upon the instructions in the court's charge and the evidence admitted at trial. *Boyde*, 513 S.W.2d at 590.

Before admitting expert testimony a court must be satisfied (1) that the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is appropriate for expert testimony; and (3) that admitting the expert

testimony will actually assist the fact finder in deciding the case. *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995). The specialized knowledge qualifying a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or some combination thereof. *Dixon v. State*, 244 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (holding officer qualified to testify as an expert about the behavior of family-violence victims because over his twenty-three year career he had received training relating to family violence, investigated family-violence crimes as a member of the Family Violence Unit, and was involved in over 300 family violence investigations); *see also Alvarado*, 912 S.W.2d at 215–16 (holding officer qualified as expert on bloodstain pattern interpretation because he explained the methodology, testified it was based on general principles of physics and mathematics, and had received sixty hours of professional training and done personal research); *Banda v. State*, 890 S.W.2d 42, 58–59 (Tex. Crim. App. 1994) (holding Texas Ranger qualified to testify about whether there was sufficient evidence to charge a different unindicted suspect because he had nineteen-years' experience with the Texas Rangers, his main duty was to perform criminal investigations, and he had 2,000 hours of criminal investigation training); *Barnes v. State*, 634 S.W.2d 25, 27–28 (Tex. App.—Beaumont 1982, no pet.) (holding officer qualified to testify about whether the amount of methamphetamine possessed by a defendant made him a dealer because he had seven-years' experience as an undercover narcotics agent and made hundreds of buys per year).

Skelton complains about the prosecution's line of questioning that elicits testimony from Ranger Smith that Skelton filed a forged document. The following colloquy provides the context of the testimony necessary to understand her complaint:

PROSECUTOR: Ranger Smith, are you a lawyer?

RANGER SMITH: No, ma'am.

PROSECUTOR: Have you ever been to law school?

RANGER SMITH: No, ma'am.

\* \* \*

PROSECUTOR: Everything that you do in your investigations and in your duties and in your line of work has to do with criminal cases?

RANGER SMITH: That's correct.

PROSECUTOR: Are you familiar with the Penal Code?

RANGER SMITH: Yes, ma'am.

PROSECUTOR: Did you have to learn and keep informed of the Penal Code in regard to the course of your duties as a Texas Ranger?

RANGER SMITH: Yes, ma'am.

PROSECUTOR: Tell the jury what the Penal Code is.

RANGER SMITH: The Penal Code is basically the bible of Texas. It says what you can and you cannot do, as far as what is legal and what is not legal. It tells you what is legal, like you can't murder someone, you can't steal from another, you can't defraud or do fraudulent things. We refer to it sometimes as Texas' Bible because it has commandments in it about "What thou shalt not do."

PROSECUTOR: What did you say there would be a law like what? It is against the law to murder someone?

RANGER SMITH: Yes.

PROSECUTOR: And in that law it has elements of how you would prove that murder; correct?

RANGER SMITH: Well, that's correct, yes, ma'am.

PROSECUTOR: Or what a murder is?

RANGER SMITH: Yes, ma'am.

PROSECUTOR: Is the crime of forgery in the Penal Code?

RANGER SMITH: Yes, ma'am.

PROSECUTOR: So you are familiar with the crime of forgery?

RANGER SMITH: Yes, ma'am.

\* \* \*

PROSECUTOR: We are not here to decide who is getting what money from this alleged will?

RANGER SMITH: That's correct.

PROSECUTOR: And you don't have anything to do with that?

RANGER SMITH: No, ma'am.

PROSECUTOR: Because you know the Penal Code, and because you know the Penal Code and the statutes under forgery, do you know that the State then does not have to prove that anyone was harmed in this?

RANGER SMITH: That's correct, yes, ma'am.

PROSECUTOR: Do you know that we don't have to prove that anyone had a loss of money or that anyone gained any money?

- 19 -

RANGER SMITH: That's correct.
PROSECUTOR: And you know that because you know the Penal Code and you know how to investigate a case, and you have investigated this case for the last, what, four years?
RANGER SMITH: Yes, ma'am.
PROSECUTOR: Or for a good many years anyway.
RANGER SMITH: Yes, ma'am.
PROSECUTOR: And you are here to testify today that from your investigation and your training and experience and everything that you found out to be true, from the physical evidence that we have, from the shredded will, from the cell phone records and all of the documents that we have gone over here today, that in your opinion and in your training and experience as a Texas Ranger that the defendant filed a forged document?
RANGER SMITH: That's exactly right, yes, ma'am.

Skelton complains her counsel rendered ineffective assistance by failing to object to the prosecutor's final question. She argues that Ranger Smith's testimony was objectionable as an opinion of Skelton's guilt and that Ranger Smith was not qualified to testify as an expert about the Penal Code's requirements for forgery.

Skelton's counsel agreed at the habeas hearing that he did not object to Ranger Smith's testimony and that a law enforcement officer is not entitled to give an opinion as to whether a defendant is guilty. He also testified that if he had objected to the evidence, it probably would have been error for the court to overrule his objection. He testified different lawyers handle such a question in different ways; he chose to undermine Ranger Smith's testimony by showing that he did not look at certain evidence that truly reflected whether the will was in accord with the testator's intent. On cross-examination, the State's habeas counsel suggested the actual focus of the prosecutor's final question was whether Ranger Smith thought a forged will had been *filed*. Skelton's counsel agreed and said he did not interpret the prosecutor's question as asking the Ranger's opinion of Skelton's guilt.

We do not agree that this is a reasonable interpretation of the prosecutor's question. The parties agreed Skelton's intent was the crux of the case, and part of the State's theory of the case at trial was that Skelton showed her intent to defraud or harm by the very act of filing the forged will with the court. To interpret the prosecutor's question as only asking whether Ranger Smith believed Skelton *filed* a forged will, would be to ignore that filing the will was the very act on which the State relied to show Skelton's intent. The natural interpretation of the long, extended question is that the State asked Ranger Smith whether Skelton was guilty of forgery. This reading accounts for the entirety of the State's question, asking Ranger Smith to judge from his investigation, the evidence, and his experience whether Skelton "*filed* a *forged* will"—which, under the State's theory of the case, shows culpable intent and the complete act of forgery. We conclude that Ranger Smith gave his opinion about Skelton's guilt. *See Boyde*, 513 S.W.2d at 590 ("[T]he expression of guilt or innocence in this case [is] a conclusion to be reached by the jury based upon the instruction given them in the court's charge, coupled with the evidence admitted by the judge through the course of the trial. Thus, no witness was competent to voice an opinion as to guilt or innocence."); *Spaulding v. State*, 505 S.W.2d 919, 923 (Tex. Crim. App. 1974) ("'When the jurors are as well qualified to speak as the witness, the opinion of the witness on the very issue to be determined by the jury is not permitted.'") (quoting *Farmer v. State*, 255 S.W.2d 864, 868 Tex. Crim. App. (1952)).

The prosecutor's question also elicited expert testimony from Ranger Smith about Skelton's guilt according to the Penal Code's definition of forgery without having established he was qualified to do so. Unlike other cases where officers properly testified as experts, Ranger Smith did not testify that he had any expertise with forgery investigation either by specific training or experience in investigating such crimes or that he possessed any specialized knowledge of the Penal Code's definition of forgery. *See Alvarado*, 912 S.W.2d at 215–16; *Banda*, 890 S.W.2d at

58–59; *Dixon*, 244 S.W.3d at 479; *Barnes*, 634 S.W.2d at 27–28. Moreover, Ranger Smith's testimony was not helpful to the jury because he did nothing more than apply the facts of his investigation to his "expert" knowledge of the law—or in other words, give his opinion of Skelton's guilt. *See Boyde*, 513 S.W.2d 588, 590; *DeLeon*, 322 S.W.3d at 382 (expert testimony helpful because it identified characteristics displayed by child victims of abuse); *cf. Fairow*, 943 S.W.2d at 900 (discussing "helpfulness" in the context of lay witness testimony). An objection to the State's attempted qualification of Ranger Smith as an expert witness would have been appropriate. But on its own, the lack of objection to Ranger Smith's testimony is not evidence of deficient performance because the record does not disclose whether the State could have properly qualified him as an expert; it may be reasonable trial strategy to not highlight a proffered expert's qualifications and thereby make him more credible. *See Blumenstetter v. State*, 135 S.W.3d 234, 245 (Tex. App.—Texarkana 2004, no pet.). Were we only reviewing whether Skelton's counsel was deficient for not objecting to Ranger Smith's expert testimony about some aspect of forgery under the Penal Code, we likely would not hold his lack of objection supports deficient performance.

But that is not the case here. Not only was Ranger Smith's opinion of Skelton's guilt clearly inadmissible, his opinion was more damaging than it would have otherwise been, framed as the "expert" opinion of a Texas Ranger. Skelton's counsel did not offer a strategic reason for not objecting to this testimony, other than an explanation he did not understand the question to be asking whether Skelton was guilty. We conclude that counsel's lack of objection to this testimony supports Skelton's claim that he performed below a reasonable standard of representation.

### d) *Hearsay & Witness Bolstering*

The State's theory that Canales did not execute a will was supported by the testimony of Canales's sister, Irene Canales, who was part of the lawsuit contesting the validity of the probated

will. She testified that on the Friday afternoon of the will's alleged execution, Canales was en route to her home in Buda, Texas, so they could travel to Louisiana to gamble that weekend. She testified she spoke to Ranger Smith about casino records that confirmed her belief that this particular weekend she and Canales gambled in Shreveport; he therefore could not have executed a will on the alleged date because he would have been en route to her home.

Skelton argues Irene's testimony about the casino records was inadmissible because it was hearsay about unauthenticated records that was elicited to improperly bolster Irene's credibility. Business records are hearsay and inadmissible unless and until the predicates of the business-record exception are met. *See* TEX. R. EVID. 802, 803(6). "Backdoor hearsay" is when a party attempts to "circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly" "where there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom." *Schaffer v. State*, 777 S.W.2d 111, 113–14 (Tex. Crim. App. 1989). "Bolstering occurs when one party introduces evidence for the purpose of adding credence or weight to earlier unimpeached evidence offered by that same party." *Rousseau v. State*, 855 S.W.2d 666, 681 (Tex. Crim. App. 1993).

Irene's testimony was inadmissible "backdoor hearsay." *See Schaffer*, 777 S.W.2d at 113–14. By testifying that the casino records—which were inadmissible without meeting the strictures of Rule 803(6)—confirmed her recollection that she and her brother were gambling that weekend, Irene implicitly testified to the contents of the records. *See id.* However, the testimony was not improper bolstering because it was an attempt to rehabilitate Irene's credibility after it was challenged on cross-examination, partly on the basis of her memory. *See Rousseau*, 855 S.W.2d at 681.

Skelton's counsel did not object to Irene's testimony at that time. However, the next day he asked the court to strike that part of her testimony. The court agreed that it should not have been

admitted, but stated only that he would not consider it; no instruction to the jury to disregard the testimony appears in the record. At the habeas hearing, Skelton's counsel agreed the records probably were not admissible, but testified that Irene had such poor credibility it did not matter what she said. His opinion about her credibility was based on her status as a plaintiff in the will contest, which was a topic of his cross-examination. He did not remember asking the judge to strike her testimony. In this instance, we are confronted with the dissonance between the counsel's action at trial, moving to strike Irene's testimony after the fact, and his testimony that an objection would have been of low value because Irene's credibility had been impeached. Because Skelton's counsel had cast doubt upon Irene's credibility and we consider it a reasonable trial strategy to not object to the testimony of an already credibility-compromised witness, we conclude Skelton's counsel acted pursuant to objectively reasonable trial strategy.

### e) *Improper Jury Argument*

Skelton complains her counsel failed to object to improper jury arguments made by the prosecution. Proper jury argument falls within one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to argument of opposing counsel; and, (4) pleas for law enforcement. *Ex parte Drinkert*, 821 S.W.2d 953, 957 (Tex. Crim. App. 1991).

Skelton's first complaint is that her counsel should have objected when the prosecution referenced the invocation of her rights. However, because her counsel did not object when the prosecution first introduced evidence that Skelton invoked her rights and because he also elicited that same testimony, we conclude that the prosecution's actions arguably may be described as summarizing the evidence against Skelton. Thus, we cannot say the trial court would have abused its discretion by denying an objection to this argument.

Skelton's second and third complaints are based on her counsel's lack of objection to another part of the prosecution's rebuttal argument:

> This forgery here, actually it never ended. It begins with the cutting and the taping and the pasting, and the never getting permission to do such a thing, and then you have the copying, the deceiving, the deceiving of a court in the application, and then not notifying everybody that should have been notified, and never telling anybody what she had done, to the hiding of the evidence from law enforcement, and then hiring a criminal defense attorney to run around criticizing and complaining about the way everybody is doing their job, to where it actually continues on here today, and here during this trial even, in the adding of facts to get you to take your eye off of the ball.

Skelton argues her counsel should have objected because the prosecution expanded its theory of the case beyond the indictment into the crime of forgery by passing. As discussed earlier, we considered this issue on Skelton's direct appeal and we found no error in the prosecution's reference to Skelton's act of presenting the will she created to the court. The prosecutor's references to Skelton's filing of the will with the court went to Skelton's intent to defraud or harm and were therefore proper jury argument.

Skelton also argues that her counsel should have objected to that argument because the prosecution struck at her over the shoulders of her counsel by arguing Skelton was guilty in part by "hiring a criminal defense counsel to run around criticizing and complaining about the way everybody is doing their job."

The State may not strike at a defendant over the shoulders of her counsel or attack the personal integrity of defense counsel. *George v. State*, 117 S.W.3d 285, 288 (Tex. App.—Texarkana 2003, pet. ref'd). The courts maintain a "'special concern for final arguments that result in uninvited and unsubstantiated accusation of improper conduct directed at a defendant's attorney.'" *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (quoting *Orona v. State*, 791 S.W.2d 125, 128 (Tex. Crim. App. 1990). Egregious examples of such argument include

accusing defense counsels of manufacturing evidence or contrasting the ethical obligations of prosecutors and defense counsels. *Id.* at 258. More mild statements are not necessarily reversible error. *Id.* at 259; *see also Dinkins v. State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995) (holding prosecutor's argument "[n]ow, [defense counsel] wants to mislead you a little bit by saying if you find . . ." was error although harmless error). In this case, the prosecutor made only a passing reference to the actions of Skelton's counsel. Skelton's counsel testified at the hearing that he thought the State was overreaching and the jury would see through the improper argument. Because we cannot say that the trial court would have abused its discretion by denying an objection on this ground, counsel's lack of objection to this argument does not support Skelton's claim.

### f) Conclusion

We have identified three points at Skelton's trial where her counsel's performance fell below an objective standard of reasonable representation. The first point is when her counsel allowed the prosecution to elicit testimony that Skelton invoked her rights to counsel and to remain silent, the second is when her counsel emphasized and highlighted Ranger Smith's prejudicial testimony on cross-examination, and the third is when her counsel allowed Ranger Smith to testify as an "expert" that Skelton was guilty of forgery.

The totality-of-the-representation standard for evaluating claims of ineffective assistance of counsel is deferential to trial counsel and does not favor finding deficient performance for "isolated errors." *Thompson*, 9 S.W.3d at 813; *Nailor*, 149 S.W.3d at 130. However, in a case where the defendant's exculpatory claim rests on her credibility, defense counsel performs deficiently by allowing the jury to hear prejudicial and clearly inadmissible evidence that attacks the defendant's credibility without objection because such evidence could serve no strategic value. *See Robertson*, 187 S.W.3d at 484; *Menchaca*, 854 S.W.2d at 133; *Garcia*, 308 S.W.3d at 68–69; *Stone*, 17 S.W.3d at 353–54; *see, e.g., Crews*, 2014 WL 969964, at *4. Although those cases

primarily consider counsel's ineffectiveness for failing to object to inadmissible 404(b) evidence, or for deliberately introducing such evidence, we have not been presented with a sound basis for distinguishing those courts' reasoning from the inadmissible evidence in this case. Because Skelton's defense rested in large part on her credibility and her counsel failed to object to inadmissible evidence that was severely prejudicial to her credibility, we hold that Skelton's counsel performed below an objective standard of reasonable representation.

### Prejudice

To meet the second prong of the Strickland test, Skelton must show that she was prejudiced by her counsel's deficient performance—i.e., she must show that there is a reasonable probability that, but for her counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. 668, 687 (1984); *Thompson*, 9 S.W.3d at 812–13. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Thompson*, 9 S.W.3d at 812–13.

Prejudice must be evaluated in the overall context of the record. *See Menchaca*, 854 S.W.2d at 133. If counsel performed deficiently by eliciting or failing to object to inadmissible and prejudicial evidence, one relevant consideration is whether that evidence permeated the defendant's trial. *See id.* Another consideration is whether the inadmissible evidence impacted the defendant or other witnesses' credibility in a case that primarily turned on the jury's credibility determinations. *See id.*; *Stone*, 17 S.W.3d at 353; *see, e.g., Crews*, 2014 WL 969964, at *4.

The record from Skelton's trial shows that both the prosecution and the defense viewed Skelton's credibility and her exculpatory story as crucial to the trial, and it also reflects that the inadmissible evidence of Skelton's invocation of her rights was repeatedly placed before the jury. We have already explained how the prosecution elicited that testimony on its direct examination of Ranger Smith, and how Skelton's counsel revisited and highlighted that testimony before the

jury. That cross-examination allowed the prosecution to emphasize Ranger Smith's inadmissible testimony—in a highly inflammatory way—on redirect:

PROSECUTOR: Defense counsel asked you about the defendant invoking her Fifth Amendment right. Will you go back—Well, do you have a copy of the report, the one that is labeled "Synopsis, Number 3—It was Number 3, Page 2 of 11; correct?

RANGER SMITH: I believe that's correct, yes, ma'am.

PROSECUTOR: When he was asking you questions about when you were asking her questions—I have a copy of it right here.

RANGER SMITH: Okay, that will save time.

\* \* \*

DEFENSE: Yes, okay. I have no objection to him reading that. You are talking about the last three sentences of that paragraph?

PROSECUTOR: Yes. . . . Go ahead.

RANGER SMITH: "Shortly a local counsel and business associate of Skelton's walked in. He was identified as Bob Galvan. Galvan and Skelton agreed that he would represent her in this investigation, and no further questions were asked."

PROSECUTOR: And is what you did the thing to do? Is that the proper procedure when someone does lawyer-up or what we call lawyer-up, like when you get a lawyer? I mean you stop asking questions then, is that correct?

RANGER SMITH: Yes.

PROSECUTOR: And if you continue to ask them questions, that wouldn't be following procedure and policy, and you could get in trouble for doing that, couldn't you?

RANGER SMITH: I mean the trouble you would get into, and any information that you gained after you did something technically against the court proceedings and the *Miranda* warning, is that you would not be able to admit that as evidence in court, or whatever was discussed after that. I mean, you know, it would be what would be called here in court as inadmissible.

PROSECUTOR: It's also her Fifth Amendment right not to talk after she has a lawyer?

RANGER SMITH: That is correct. That is one of your constitutional rights.

The prosecution's inflammatory characterization of Skelton's invocation of her constitutional rights as "lawyering up" further undermined Skelton's credibility prior to her presentation of her exculpatory story and again invited the jury to find her guilty based on the inference that only guilty persons "lawyer up." *See Hardie*, 807 S.W.2d at 322; *Moreno*, 185 F.3d at 473.

While on the stand, Skelton referred to Ranger Smith's testimony when she denied invoking her rights to counsel and to remain silent in order to terminate the interview with Ranger Smith. We consider Skelton's own testimony relevant to the prejudice analysis because Skelton would not have been placed under the necessity of contradicting Ranger Smith's inadmissible and prejudicial testimony except for the fact that her counsel allowed it into evidence. *See Moreno*, 185 F.3d at 473. Skelton's denial was likely less than effective, given the prosecution's characterization of her as having "lawyered up" to terminate the interview and Ranger Smith's "expert" testimony that she was guilty.

The prosecution also emphasized Skelton's invocation of her rights in its rebuttal argument:

> We went through the time that Ranger Smith did visit with her a year before the indictment, and it actually seemed like then they were going to be able to ask some questions and get some answers. Then an attorney walks in and it all stops, and that's fine. We are not here to complain about somebody invoking their Fifth Amendment rights, whether they do it formally or informally. That's their right.

Notwithstanding the prosecution's rhetorical claim that it was not "complaining" about Skelton's invocation of her "Fifth Amendment rights," its argument clearly attacks Skelton's credibility by emphasizing Ranger Smith's testimony that Skelton invoked those rights.

Shortly thereafter, the prosecution also suggested Skelton was less than credible, in part, because she hired an attorney:

> This forgery here, actually it never ended. It begins with the cutting and the taping and the pasting, and the never getting permission to do such a thing, and then you have the copying, the deceiving, the deceiving of a court in the application, and then not notifying everybody that should have been notified, and never telling anybody what she had done, to the hiding of the evidence from law enforcement, and then hiring a criminal defense attorney to run around criticizing and complaining about the way everybody is doing their job, to where it actually continues on here today, and

> here during this trial even, in the adding of facts to get you to take your eye off of the ball.

Although we held that Skelton's counsel was not deficient for failing to object to this argument, it is relevant to the prejudice analysis because it invited the jury to draw an adverse inference of guilt by suggesting that Skelton was attempting to cover up her actions by hiring an attorney.

Finally, although Ranger Smith's "expert" opinion that Skelton was guilty was not referred to again by the prosecution, it was still prejudicial because a law enforcement officer's testimony that a defendant is guilty may influence a jury's verdict. *See Weathersby v State* , 627 S.W.2d at 729, 731 (Tex. Crim. App. [panel op.] 1982) ("We are unable to say the matters that were presented to the jury without objection, and particularly the 'expert' opinion of police officers that appellant was guilty, did not influence the jury's verdict of guilty.").

When considered in the context of the overall record, we conclude that the effects of counsel's deficient performance permeated Skelton's trial. In *Ex parte Menchaca*, the habeas applicant's trial counsel allowed the prosecution to introduce evidence of a prior conviction without objection, which the prosecution emphasized in its jury arguments. 854 S.W.2d at 133. The Court found that the "applicant's prior conviction permeated the entire guilt-innocence phase of the trial." *Id.* It noted that by emphasizing the prior conviction in its argument the prosecution "[s]eiz[ed] the last opportunity to address the jurors before they began deliberating" and "used the prior conviction to undermine applicant's credibility." *Id.* The Court held that "[w]hen viewed in the context of the entire record, counsel's deficient performance undermined applicant's credibility which was at the very heart of his defense" and held that the applicant had been prejudiced. *Id.* The Court followed a similar analysis in its recent, unpublished decision in *Ex Parte Crews*, 2014 WL 969964, at *4.

Looking to the totality of Skelton's trial, we conclude that the prejudice resulting from Skelton's counsel's deficient performance permeated her trial. It harmed Skelton's credibility and damaged her defense before she was even allowed to offer her exculpatory story. The prosecution also revisited the subject on rebuttal, immediately prior to the jury's deliberations. Based on this record, we hold that Skelton made the required showing that there is a reasonable probability she would not have been convicted but for her attorney's unprofessional errors. The record shows Skelton is entitled to habeas relief because her counsel was ineffective.

### ACTUAL INNOCENCE

The habeas court denied Skelton's actual innocence claim as frivolous, and we did not remand the case to the habeas court for findings and conclusions regarding this claim. Therefore, we review its determination that Skelton was manifestly not entitled to relief on this claim de novo. *Ex parte Zantos-Cuebas*, 2014 WL 715057, at *4.

Skelton argues that the conflicting verdicts between the criminal and civil trials related to the will is "new evidence" establishing her actual innocence. She then argues that, because her claim of actual innocence is accompanied by claims of ineffective assistance of counsel and prosecutorial misconduct, she is only required to produce enough "new evidence" to show that "it is more likely than not that no reasonable juror would have convicted her in the light of the later determination of the will's genuineness." This is a so-called *Schlup*-type claim of actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 327–332 (1995); *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008). The *Schlup*-type actual innocence claim created by the United States Supreme Court is not a substantive, independent ground for granting habeas relief.[7] *Schlup*, 513 U.S. at 314;

---

[7] Skelton does not argue that the civil jury verdict meets the "Herculean" burden of "unquestionably establish[ing her] innocence" that is required to sustain a "bare claim of innocence." *See Ex parte Brown*, 205 S.W.3d 538, 544–45 (Tex. Crim. App. 2006).

*Reed*, 271 S.W.3d at 733. It is, instead, an exception to the federal abuse-of-the-writ doctrine, which procedurally bars a court from considering a successive application for habeas corpus. *Schlup*, 513 U.S. at 317–23; *Ex parte Brooks*, 219 S.W.3d 396, 399–400 (Tex. Crim. App. 2007). Under *Schlup*, if a federal habeas applicant makes a prima facie showing of actual innocence in a successive habeas application, a court is allowed to consider the merits of the underlying constitutional errors alleged in the application, *e.g.*, *Brady* violations or ineffective assistance of counsel. *Schlup*, 513 U.S. at 316; *Brooks*, 219 S.W.3d at 399–400. The Texas Legislature has essentially adopted and codified the *Schlup* exception to the state abuse-of-the-writ doctrine in certain state habeas proceedings.[8] *Reed*, 271 S.W.3d at 733; *Brooks*, 219 S.W.3d at 399–400; *see* TEX. CODE CRIM. PROC. art. 11.07, § 4(a)(2) (West Supp. 2013); *id.* art. 11.071, § 5(a)(2) (West Supp. 2013).

Skelton's *Schlup*-type claim of actual innocence is improper because this is her first application for habeas corpus. *See Ex parte Villegas*, 415 S.W.3d 885, 886–87 (Tex. Crim. App. 2013) (per curiam) (holding habeas applicant's *Schlup*-type actual innocence claim was improper because it was his first application but nevertheless granting relief on his ineffective-assistance-of-counsel claim). Therefore, she does not need to pass through a procedural gateway to present her substantive claims of constitutional error. *See id*. Skelton was manifestly not entitled to relief on her *Schulp*-type actual innocence claim and the habeas court did not err by denying it as "frivolous."

---

[8] Although we address her *Schulp*-type claim, we note that it does not appear the Legislature has adopted the *Schlup* exception to the abuse-of-the-writ doctrine to habeas proceedings under article 11.072 of the Code of Criminal Procedure. *Compare* TEX. CODE CRIM. PROC. art. 11.072, § 9*, with id.* art. 11.07, § 4(a)(2); *and with id.* art. 11.071, § 5(a)(2).

## CONCLUSION

We reverse the order of the habeas court and grant Skelton habeas relief because the fundamental fairness of her trial was tainted by the ineffective assistance of her trial counsel. Accordingly, we vacate the judgment in cause number 2004-0934-DR from the 38th Judicial District Court of Real County, Texas.

Luz Elena D. Chapa, Justice

Publish