**Opinion issued April 19, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00250-CR

_____

## EX PARTE JULIO GIALITO ARUIZU, Appellant

---

## On Appeal from the County Criminal Court at Law No. 7
### Harris County, Texas
### Trial Court Case No. 1943590

---

## MEMORANDUM OPINION

Appellant, Julio Gialito Aruizu, challenges the trial court's order denying his application for a writ of habeas corpus.[1]  In two issues, appellant contends that the trial court erred in denying his requested relief, which he seeks on the grounds that

---

[1]  *See* TEX. CODE CRIM. PROC. ANN. art. 11.09 (Vernon 2015).

he is actually innocent of the underlying misdemeanor offense of assault on a family member[2] and his trial counsel rendered ineffective assistance.

We affirm the order of the trial court.

## Background

On May 4, 2002, Houston Police Department ("HPD") Officer T. Burks was dispatched to appellant's residence "in reference to a possible family disturbance." At the scene, the complainant, appellant's common-law wife, told Burks that appellant had assaulted her, struck her several times, "grabbed her around the neck and throat," "choked her," and "grabbed her by the hair and pulled it forcefully." Burks observed that the complainant had "red marks around her neck and upper chest area."

After his arrest, appellant retained trial counsel to represent him in court. On July 17, 2002, appellant, with an agreed punishment recommendation from the State, pleaded guilty, and the trial court assessed his punishment at confinement for fifteen days.

In January 2014, appellant filed his verified application for a writ of habeas corpus, contending that he entered his guilty plea involuntarily and unknowingly. He argues that his trial counsel rendered ineffective assistance because he failed to

---

[2]    *See* TEX. PENAL CODE ANN. § 22.01(a), (b) (Vernon 2011); *see id.* § 1.07(a)(8) (defining "bodily injury" as "physical pain, illness, or any impairment of physical condition").

(1) fully investigate defense issues and the facts of the case, including not contacting witnesses; (2) competently and fully advise appellant of his full range of options and the consequences of a guilty plea; and (3) assert viable defenses and file motions or pleadings seeking relief based on any viable defenses. Appellant asserts that he is innocent and the complainant has, in her affidavit, since recanted her previous statements and admitted that she "lied" to Officer Burks. Appellant also asserts that their son, in his affidavit, has "for the first time stated what he heard and saw" during the May 4, 2002 incident. Finally, appellant asserts that he is "illegally confined and/or restrained of his liberty by the entry of a final conviction" and is "restrained of his liberty by virtue of this criminal record." Appellant attached to his application his affidavit and those of his wife and son.

In its response to appellant's application, the State argues that the defense of laches bars appellant from receiving habeas corpus relief because his unreasonable delay in pursuing such relief prejudiced the State in making its response. The State further asserts that appellant did not meet his burden to establish that his plea was made involuntarily or that he is actually innocent.[3] Attached to the State's response is the HPD offense report of Officer Burks and the affidavit of appellant's trial counsel. In his reply, appellant asserts only that the affidavits attached to his

---

[3]    *See Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995); *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993).

3

application "fully support[]" his actual-innocence claim and the trial court could determine the claim and issue findings of fact and conclusions of law based on the pleadings filed with the court.

No witnesses testified at the hearing on appellant's application. Rather, the trial court, without objection, admitted into evidence the State's response to appellant's application. And after he asked the court to take judicial notice of the affidavits attached to his application, appellant tendered them to the court. The trial court then indicated that it had reviewed "everything that both sides [had] filed" and "considered everything that was presented."

In his affidavit, appellant testified that on May 4, 2002, after he had arrived home at about 7:00 or 8:00 p.m., the complainant confronted him outside their trailer home. "[Y]elling" and "very upset," she accused him of seeing another woman. Although appellant tried to tell the complainant "to cool down and stop yelling," she continued to yell at him for fifteen to twenty minutes before she went back inside the trailer. Appellant explained that their son "was right inside the trailer front door in the living area and heard what had just happened." Appellant "never threatened, pushed, touched, or hit" the complainant, and he told the police that he "never threatened, pushed, hit, or touched" her.

Appellant further testified that he "was bonded out of jail after the arrest," hired trial counsel to represent him, and told trial counsel "what happened that day and evening, exactly the same facts" as detailed in his affidavit.  He explained:

> I told [trial counsel] that I never threatened or touched [the complainant], and that our son . . . heard everything that happened outside.
>
> [Trial counsel] never discussed with or asked me about trying to get a statement from either [our son] or [the complainant] about what happened at the trailer.  [Trial counsel] never asked me for any information on how to contact either [our son] or [the complainant].  [Trial counsel] never told me that he or anyone working with him ever contacted or tried to contact [our son] or [the complainant] or any other potential witness.  During the entire time of this case before I pleaded "Guilty," [our son], [the complainant], and I still lived at the same trailer.  Anyone could have found and talked to [our son] and [the complainant] at that trailer.
>
> [Trial counsel] never talked to me about any possible defenses for my case.  [Trial counsel] never discussed with me the possible uses of eyewitnesses such as [our son] or [the complainant].  All [trial counsel] said about defending the assault charge was that even if [the complainant] requested to dismiss the case that the prosecutor would still keep the case.  Lastly, [trial counsel] said to me that "[I] had a job, it was a good judge, and if [I] wanted to defend the case or go to trial that [I] would be in court many more times, and that [my] boss would probably get mad and fire [me]."  [Trial counsel] did not discuss anything more about the facts of the case or any possible defenses.  [Trial counsel] never discussed with me any aspects of a potential jury trial for the facts of my case, nor did he discuss with me any jury trial strategy or potential success at jury trial.  [Trial counsel] never discussed with me the potential uses and effectiveness of any potential witness.  In sum, [trial counsel] never discussed with me any matters of a jury trial strategy.  The only jury trial advice [trial counsel] discussed with me was that "if [I] wanted to defend the case or go to trial that [I] would be in court many more times, and that [my] boss would probably

get mad and fire [me]." At that point, I thought that nothing at all could be done about the case, and I decided to plea[d] "Guilty."

Had my lawyer investigated the case, explained to me the potential jury trial strategies and options, and advised me of potential chances of success (after fully investigating the case) at jury trial, I would not have pleaded "Guilty," but instead I would have insisted on going to jury trial because I was innocent of the criminal charges and I had an eyewitness who saw and heard what really happened. And furthermore, the case and jury trial would not have been all that bad for me because of the lack of any physical evidence or other evidence supporting [the complainant's] claim that I pushed her. But I am not a lawyer, so I do not know how all those things work together in a case and/or a jury trial. I had no indications from my lawyer that I would have had a chance of winning at jury trial. That left me thinking I ultimately had no chance at winning at jury trial. Because I did not have any knowledge that at a jury trial I would have had a chance at winning the case, I pleaded "Guilty." . . .

This is the first time that I know of what [the complainant] has said that she made up the story about my pushing or hitting her that day, May 04, 2002. She recently said it in a visit with my lawyer . . . .

In her affidavit, the complainant testified that when appellant came home at about 7:00 or 8:00 p.m., she confronted him, began screaming and yelling, and was "very angry and upset with [him] and the situation with the woman." She explained that after she went back into the trailer, she called for emergency assistance and reported that appellant had pushed her during an argument. And she later told the responding police officer that appellant had pushed her. She further explained that she "never said to 911 or the police [officer] that [appellant had] threatened [her], or that [she] felt any kind of pain or had any injury from [him]." Rather:

6

[A]ppellant never threatened, touched, pushed, or hit me. I lied to 911 and the police about [appellant] pushing me. . . . I was so upset at [him] and did not know what else I could do to him. I wanted to get back at him. I only said that [appellant] pushed me because I did not know what else to do to get back at him.

According to the complainant, after May 4, 2002, "no lawyer, police, investigator, or anyone investigating the incident [had] talked to [her]." She had never had "any reason or circumstance" to tell anyone that she had lied about appellant pushing her. And she was "very disappointed and ashamed" about what she had said about appellant to the police officer.

In his affidavit, appellant's son, who was approximately fourteen years old at the time of the incident, testified that on May 4, 2002, he lived with the complainant and appellant. He recalled that when appellant came home at approximately 7:00 to 8:00 p.m., the complainant immediately went outside and confronted him. Although appellant's son heard the complainant screaming and yelling at appellant, appellant "was not screaming and yelling like" the complainant. And appellant's son did not hear any sounds of violence or physical fighting while his parents were outside. When the complainant came back inside the trailer, he could see that she "was very angry and upset," but he "did not see any signs of physical pain, discomfort, or injury to [her] when she walked into the trailer." Appellant's son noted that the responding police officer did not talk to him that day and "no lawyer, police, investigator, or anyone investigating the incident [had] talked to [him]." And because he had "never

7

been asked to tell about what happened," providing his affidavit testimony constituted "the first time [that he had] said or told anyone about what [he] witnessed on May 04, 2002."

In the HPD offense report, dated May 5, 2002, Officer Burks wrote that on May 4, 2002, he was dispatched to a "trailer park" regarding a possible family disturbance. Upon his arrival, he spoke with the complainant through a Spanish interpreter. The complainant stated that after she had received a telephone call from a woman who claimed to be appellant's girlfriend, the complainant and appellant "became involved in a heated verbal argument" and she left their trailer. Appellant "later came to her friend's residence and forced her to leave" with him. When the complainant attempted to get out of the car, appellant "struck her several times[,] causing her physical pain." After they returned to their trailer, appellant and the complainant continued to argue, and he "assaulted her," "grabbed her around the neck and throat," and "choked her," "causing her physical pain." He then "grabbed her" by her "hair and pulled it forcefully," "causing her physical pain." Burks further wrote that he saw that the complainant "had red marks around her neck and upper chest area." Burks further noted that the complainant stated that appellant had assaulted her numerous times during the past twelve years and although "she [had] never called before because she depended on [appellant] financially," she did so on this occasion because "she [was] just tired of the assaults and abuse."

8

In his affidavit, appellant's trial counsel responded to issues that the trial court designated to him. In response to each designated issue, trial counsel stated that he "[did] not have any present recollection of the case." He noted that "it has been so long ago," he did not "have a defense file to recall such attempts" because he had "since relocated" his office, and he "no longer kn[e]w where [his] 2002 file may be."

The trial court denied appellant's requested habeas corpus relief and signed the State's proposed findings of fact and conclusions of law. The trial court found and concluded, in pertinent part, as follows:

16. [Appellant's] claim of ineffective assistance of counsel is barred by the doctrine of laches. Due to the [appellant's] unreasonable delay of almost twelve years in pursuing his habeas claims, the State has been prejudiced in its ability to respond to the [appellant's] habeas claims, and therefore the [appellant's] ineffective assistance claim is denied.[4]

17. The court finds that the affidavits provided by the defendants, [the complainant], and [appellant's son] are not credible and do not rise to the level of actual innocence under either a *Herrera* or a *Schlup* claim.

18. The [appellant] has failed to prove under *Herrera* that by clear and convincing evidence that a jury would acquit him based on newly-discovered evidence.[5] He has also failed to prove under *Schlup* that, in light of newly discovered evidence, the constitutional error "probably" resulted in a conviction of the one who was actually innocent.[6]

---

4    *See Ex parte Carrio*, 992 S.W.2d 486, 487 (Tex. Crim. App. 1999).

5    *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996).

6    *Id.*

9

19. In all things, the [appellant] has failed to demonstrate that his conviction was improperly obtained.

## Standard of Review

Generally, an applicant seeking post-conviction habeas corpus relief must prove his claims by a preponderance of the evidence. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002). In reviewing a trial court's decision to deny habeas corpus relief, we view the facts in the light most favorable to the trial court's ruling. *Ex parte Peterson,* 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 336 (Tex. Crim. App. 2007). We afford almost total deference to the court's findings of fact that are supported by the record, especially when the trial court's fact findings are based upon an evaluation of credibility and demeanor. *Ex parte Amezquita,* 223 S.W.3d 363, 367 (Tex. Crim. App. 2006) (quoting *Ex parte White*, 160 S.W.3d 46, 50 (Tex. Crim. App. 2004)); *Ex parte Peterson,* 117 S.W.3d at 819. We afford the same level of deference to the trial court's rulings on "applications of law to fact questions" if the resolution of those questions turn on an evaluation of credibility and demeanor. *Ex parte Peterson,* 117 S.W.3d at 819. In such instances, we use an abuse-of-discretion standard. *See Ex parte Garcia*, 353 S.W.3d 785, 787 (Tex. Crim. App. 2011). However, if the resolution of those ultimate questions turns on an application of legal standards absent any credibility issue, we review the determination de novo. *See Ex parte Peterson,* 117 S.W.3d at 819. We will affirm the trial court's decision

10

if it is correct on any theory of law applicable to the case. *Ex parte Primrose*, 950 S.W.2d 775, 778 (Tex. App.—Fort Worth 1997, pet. ref'd).

### Actual Innocence

In his first issue, appellant argues that the trial court erred in denying him habeas corpus relief because he is actually innocent of the offense of assault on a family member. He asserts that the record supports both his actual-innocence claim and his innocence claim "coupled with trial counsel's deficient performance." *See Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995); *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993).

The Texas Court of Criminal Appeals has explained that a *Herrera* claim of actual innocence is "a substantive claim in which the person asserts a 'bare claim of innocence' based solely on newly discovered evidence." *Ex parte Brown*, 205 S.W.3d 538, 544 (Tex. Crim. App. 2006) (quoting *Ex parte Tuley*, 109 S.W.3d 388, 390 (Tex. Crim. App. 2002)). A defendant who pleaded guilty to an offense may assert, as an applicant for habeas corpus relief, an actual-innocence claim based on newly discovered evidence. *Ex parte Mello*, 355 S.W.3d 827, 830–31 (Tex. App.—Fort Worth 2011, pet. ref'd) (citing *Ex parte Brown,* 205 S.W.3d at 544). For a *Herrera*-type claim, evidence is considered "newly discovered" if it was not known to the applicant at the time of the trial, plea, or post-trial motions and could not have been known to him even with the exercise of due diligence. *Ex parte Brown*, 205

11

S.W.3d at 545. To establish a claim of actual innocence, "an applicant must show 'by clear and convincing evidence, that despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence.'" *Id.* (quoting *Ex parte Tuley*, 109 S.W.3d at 392). "This showing must overcome the presumption that the conviction is valid and it must unquestionably establish applicant's innocence." *Id.* In deciding this issue, the trial court examines the "newly discovered evidence" and determines whether the "new" evidence, when balanced against the "old" inculpatory evidence, unquestionably establishes the applicant's innocence. *Ex parte Thompson*, 153 S.W.3d 416, 426 (Tex. Crim. App. 2005). The court of criminal appeals has noted that, generally, "[e]stablishing a bare claim of actual innocence is a Herculean task." *Ex parte Brown,* 205 S.W.3d at 545.

Here, appellant asserts that the three affidavits that he attached to his application constitute "clear, direct, corroborative, and credible new evidence" that he did not assault the complainant. However, even assuming that the evidence presented in the affidavits is new, it does not constitute clear and convincing evidence that unquestionably establishes appellant's innocence.

Officer Burks's narrative in the HPD offense report reflects that after he arrived at appellant's residence, the complainant reported to him that appellant forced her to leave her friend's residence and "struck her several times." And the

complainant specifically told Burks that appellant had "grabbed her around the neck and throat," "choked her," and "grabbed [her] by her hair and pulled it forcefully." Moreover, Burks himself observed "red marks around [complainant's] neck and upper chest area."

Although the complainant, in her affidavit, testified that she had "lied" when she called for emergency assistance and to the responding police officer, she stated only that she had "lied' about appellant having pushed her. And, although she stated generally that appellant "never threatened, touched, pushed, or hit [her]," she, in her affidavit, provided less detail than the narrative contained in the HPD offense report. Moreover, she, in her affidavit, did not address any assault that occurred when appellant forced her to leave her friend's residence. Appellant's son, in his affidavit, testified that he did not observe the incident between appellant and the complainant outside the trailer, and he did not hear "any sounds of violence or physical fighting while [his] parents were outside." And, when the complainant came back inside the trailer, he "did not see any signs of physical pain, discomfort, or injury to [her]" However, none of the affidavit evidence provides any contradiction or explanation for Officer Burks's statement in the HPD offense report that he actually saw red marks on the complainant's neck and upper chest.

Considering the evidence in the light most favorable to the trial court's ruling and deferring to the trial court's findings of fact and conclusions of law supported

13

by the record, we hold that the evidence supports the trial court's finding that appellant failed to prove by clear and convincing evidence his *Herrera*-type claim of actual innocence.

Appellant further contends that the record supports his *Schlup*-type claim of innocence coupled with his trial counsel's deficient performance. Appellant asserts that his "*Schlup*-type claim is, in essence, a *Herrera*-type claim coupled with an independent trial-counsel deficien[cy] claim, without an independent showing of prejudice."

As explained by the court of criminal appeals, a *Schlup*-type claim is "one that 'does not by itself provide a basis for relief,' but is intertwined with constitutional error that renders a person's conviction constitutionally invalid." *Ex parte Brown*, 205 S.W.3d at 544–45 (quoting *Schlup*, 513 U.S. at 315, 115 S. Ct. at 860); *see Ex parte Villegas*, 415 S.W.3d 885, 886 (citing *Schlup*, 513 U.S. at 314–15, 115 S. Ct. at 860–61) ("In a *Schlup* actual-innocence claim, evidence demonstrating innocence is a prerequisite the applicant must satisfy to have an otherwise barred constitutional claim considered on the merits."). In a *Schlup*-type claim, the applicant "must show that the constitutional error probably resulted in the conviction of one who was actually innocent." *Ex parte Spencer*, 337 S.W.3d 869, 878 (Tex. Crim. App. 2011). "Probably resulted" means that an applicant "'must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'"

14

*Ex parte Franklin*, 72 S.W.3d at 676 (quoting *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867).

Appellant asserts that his evidence meets *Schlup*'s "lesser burden of proof" to establish his innocence, and he relies on his argument made in support of his *Herrera* claim. The trial court, however, found that the affidavits upon which appellant relies "[did] not rise to the level of [establishing] actual innocence under either a *Herrera* or a *Schlup* claim." And it concluded that he failed to establish that constitutional error resulted in a conviction of "one who was actually innocent." Considering the evidence, as discussed above, in the light most favorable to the trial court's findings of fact and conclusions of law supported by the record, we hold that appellant did not meet his burden to show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.[7]

---

[7]     *Schlup*-type claims typically arise in cases in which a defendant is procedurally barred from independently making a claim of constitutional error. *See Schlup,* 513 U.S. at 316, 115 S. Ct. at 861 (stating if petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims"). Thus, if an applicant establishes his innocence under the *Schlup* standard, a court may review a procedurally barred constitutional claim. *See Ex parte Villegas*, 415 S.W.3d 885, 886–87 (Tex. Crim. App. 2013); *Ex parte Reed*, 271 S.W.3d 698, 733–34 (Tex. Crim. App. 2008). Here, appellant does not contend that his habeas claim is procedurally barred. *See Ex parte Villegas*, 415 S.W.3d at 887 (concluding *Schlup* claim improper when applicant's ineffective assistance of counsel claims not procedurally barred); *Ex parte Skelton*, 434 S.W.3d 709, 733–34 (Tex. App.—San Antonio 2014, pet ref'd) (concluding applicant "did not need to pass through a procedural gateway" to present substantive claim of constitutional

We overrule appellant's first issue.

## Laches

In his second issue, appellant argues that the trial court erred in denying his application for habeas corpus relief because his trial counsel provided him with ineffective assistance. At the hearing on appellant's application, the State argued that the trial court should deny appellant habeas corpus relief based on the doctrine of laches because appellant's unreasonable delay in filing the application materially prejudiced the State in regard to responding to the application. And the trial court found that the doctrine of laches barred appellant's claim of ineffective assistance of counsel: "Due to [appellant's] unreasonable delay of almost twelve years in pursuing his habeas claims, the State has been prejudiced in its ability to respond to [appellant's] habeas claims, and therefore [appellant's] ineffective assistance claim is denied."

In 2013, the Texas Court of Criminal Appeals adopted "Texas common law, rather than the federal [laches] standard, to define the parameters" of the defense of laches in Texas habeas corpus cases:

> Consistent with the common-law doctrine of laches, going forward, we will (1) *no longer require the State to make a "particularized showing of prejudice"* so that courts may more broadly consider material prejudice resulting from delay, and (2) expand the definition of prejudice under the existing laches doctrine *to permit consideration of*

error and *Schlup* claim improper because habeas application was applicant's first application).

16

*anything that places the State in a less favorable position*, *including prejudice to the State's ability to retry a defendant*, so that a court may consider the totality of the circumstances in deciding whether to grant equitable relief.

*Ex parte Perez*, 398 S.W.3d 206, 215 (Tex. Crim. App. 2013) (emphasis added) (citing *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998)). The common-law doctrine of laches is defined as:

> neglect to assert [a] right or claim which, taken together with lapse of time and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. Also, it is the neglect for an unreasonable and unexplained length of time under circumstances permitting diligence, to do what in law, should have been done.

*Ex parte Carrio*, 992 S.W.2d 486, 487 n.2 (Tex. Crim. App. 1999) (quoting BLACK'S LAW DICTIONARY 875 (6th ed. 1990)). In Texas civil cases, laches is an affirmative defense that must be pleaded by the party asserting it. *See* TEX. R. CIV. P. 94. And "[l]aches is a question of fact that should be determined by considering all of the circumstances in each particular case." *In re Mabray*, 355 S.W.3d 16, 22–23 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding [mand. denied]) (citing *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 669 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)).

In *Ex parte Perez*, the court explained that the defense of laches "typically requires proof by a preponderance of the evidence of two elements: unreasonable delay by the opposing party and *prejudice resulting from the delay*." 398 S.W.3d at 210 n.3 (emphasis added) (citing *Caldwell*, 975 S.W.2d at 538). Thus, the defense

17

of laches will bar habeas corpus relief "when an applicant's unreasonable delay has prejudiced the State, thereby rendering consideration of his claim inequitable." *Id.* at 219 (citing *Ex parte Carrio*, 992 S.W.2d at 487).

In determining the issue of laches in habeas corpus cases, courts are to consider the totality of the circumstances, i.e., "factors such as the length of the applicant's delay in filing the application, the reasons for the delay, and the degree and type of prejudice resulting from the delay." *Id.* at 217. In regard to prejudice, "a court may draw reasonable inferences from the circumstantial evidence to determine *whether excessive delay has likely compromised the reliability of a retrial.*" *Id.* (emphasis added). However, even if the State presents proof of prejudice, a court still "must then weigh that prejudice against any equitable considerations that militate in favor of granting habeas relief." *Id.*

In regard to the degree of proof required, "the extent of the prejudice the State must show bears an inverse relationship to the length of the applicant's delay." *Id.* Thus, "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. Although a delay of more than five years "may generally be considered unreasonable in the absence of any justification for the delay," the court

refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." *Id.* at 210, 216 n.12.

In summing up its "expan[sion] of the scope of the prejudice inquiry," the court of criminal appeals was careful to emphasize that it was "leav[ing] intact the equitable principles" that necessarily defeat the State's reliance upon the defense of laches when a record reveals:

- an applicant's delay was not unreasonable because it was due to a justifiable excuse or excusable neglect;

- the State would not be materially prejudiced as a result of the delay; or

- the applicant is entitled to equitable relief for other compelling reasons, such as new evidence that shows he is actually innocent of the offense or, in some cases, that he is reasonably likely to prevail on the merits.

*Id.* at 218 (citing *Ex parte Blue*, 230 S.W.3d 151, 170 (Tex. Crim. App. 2007) (Keller, P.J., concurring) (courts possess "equitable discretion" to ensure "federal constitutional errors do not result in the incarceration of innocent persons") (quoting *Herrera*, 506 U.S. at 404–05, 113 S. Ct. at 862); *Ex parte Scott*, 190 S.W.3d 672, 675 (Tex. Crim. App. 2006) (Cochran, J., concurring) (suggesting equitable relief warranted notwithstanding applicant's delay in seeking habeas corpus relief where applicant shows court of appeals wrongly affirmed conviction)).

Here, appellant does not challenge the trial court's finding on the issue of laches. And the record supports the trial court's finding that laches bars his claim

19

for habeas relief, which he asserts on the ground of ineffective assistance of counsel. Although appellant pleaded guilty and was convicted in 2002, he did not file his application for habeas corpus relief until 2014. After the trial court designated issues and directed trial counsel to respond, trial counsel submitted his affidavit, stating that he did not have "any present recollection of the case" or a defense file. And he noted that he had relocated his office and did not know where his 2002 file might be. Thus, the record supports the trial court's conclusion that the State has been materially prejudiced in its ability to respond to appellant's claim that trial counsel rendered ineffective assistance.

Further, the record does not support any justification for appellant's delay in seeking habeas corpus relief. In his affidavit, appellant states that he first learned in 2014 that the complainant had said that she had "made up the story about [his] pushing or hitting her" on May 4, 2002. However, the affidavit evidence attached to appellant's application clearly establishes that he and his son visit regularly, and although he and the complainant no longer live together, their son still lived with the complainant and appellant checks with her to see how she is doing. And appellant did not present the trial court with any other compelling reason to grant him habeas corpus relief. Considering the evidence in the light most favorable to the trial court's findings of fact and conclusions of law supported by the record, we hold that that the

trial court did not err in concluding that the State's defense of laches bars appellant's habeas corpus claim based on ineffective assistance of counsel.

We overrule appellant's second issue.

## Conclusion

We affirm the order of the trial court.


Terry Jennings
Justice


Panel consists of Justices Jennings, Higley, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).