

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| FLORENCIO LANDIN, | § | No. 08-23-00307-CR |
| Appellant, | § | Appeal from the |
| v. | § | 399th District Court |
| THE STATE OF TEXAS, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2020CR0811-CR) |

## MEMORANDUM OPINION[1]

A jury found Appellant Florencio Landin guilty of two counts of indecency with a child by contact. The trial court sentenced Landin to 16 years' incarceration on each count, with the sentences to run concurrently. On appeal, Landin contends he was denied the right to effective assistance of counsel. Because we cannot say that Landin was denied effective representation of counsel based on this record, which is silent as to trial counsel's strategy, we affirm the trial court's judgment.[2]

---

[1] This case was transferred from the Fourth Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001. We follow the precedent of that court to the extent it conflicts with our own. *See* Tex. R. App. P. 41.3.

[2] See footnote 12 regarding raising a claim of ineffective assistance of counsel in a post-conviction habeas proceeding.

# I. Factual and Procedural Background

## A. Pretrial proceedings

Landin was indicted on January 29, 2020, on two counts of indecency with a child by contact.[3] Count one alleged that on or about August 21, 2017, Landin intentionally and knowingly engaged in sexual contact with C.R., a female younger than 17 years of age, by causing C.R. "to touch the part of [Landin's] genitals . . . with the intent to arouse or gratify the sexual desire of any person."[4] Count two alleged that on or about August 21, 2017, Landin intentionally and knowingly engaged in sexual contact with C.R., a female under 17 years of age, "by touching part of the genitals of [C.R.] with the intent to arouse or gratify the sexual desire of any person." Landin initially retained attorney Aldous Steven Strauch to represent him. The record does not reflect that Strauch filed any pretrial motions, and it is unclear what actions, if any, he took prior to trial.

Landin's trial was set for August 15, 2023, a Tuesday. Prior to selecting the jury, a visiting judge assigned to the case announced that Strauch had not appeared but noted that attorney Fernando Cortes appeared to represent Landin. The judge expressed concern that Cortes had not made a formal appearance, and upon questioning, Landin indicated that he had hired Cortes, whom he knew "only by reputation" but had not spoken with him. Cortes asked for a continuance until the following Monday but stated that he was nevertheless ready to proceed to trial that day. Following a brief recess in which the judge spoke with Cortes in chambers, the judge agreed to

---

[3] A person commits the second-degree felony offense of indecency with a child, "if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person: (1) engages in sexual contact with the child or causes the child to engage in sexual contact; or (2) with intent to arouse or gratify the sexual desire of any person . . . ." Tex. Penal Code Ann. § 21.11(a), (d).

[4] Because the complainant was a minor at the time the offense was committed, we use initials rather than her name for privacy. *See* Tex. R. App. P. 9.10(a)(3); *see also* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"). To further protect her privacy, we refer to her family members only by their first names.

postpone jury selection until 9:00 a.m. the next morning but stated that he wanted both Cortes and Strauch to appear.

The next morning, however, only Cortes appeared on Landin's behalf, informing the judge that Strauch was no longer representing Landin and that he had filed a substitution of counsel with the clerk's office the day before. The judge again expressed concern with Landin going to trial without Strauch, who had been representing him for several months, and to "have someone to walk in day of trial and take over a case that is -- sentencing range is 2-to-20 years in the Texas Department of Criminal Justice and up to a 10,000-dollar fine." After Landin stated that he understood, the court informed Landin that despite his concerns, Landin could proceed with whatever attorney he wanted.

Following a brief recess during which Cortes spoke with Landin, Cortes elected for the trial court to sentence Landin and the parties tendered a signed discovery acknowledgement to the court. After the jury was sworn in, the judge announced that due to time constraints, the trial would not start until the following Monday and the presiding judge would be handling it.[5]

**B. The jury trial**

The jury trial commenced the following Monday, August 21, 2023, with the judge of the 399th Judicial District Court presiding and with Cortes representing Landin.

**(1) The testimony of C.R.**

C.R., the first witness, testified as follows:

She was 16 years old at the time of trial. Her mother died when she was six years old, and because her father was in jail, she and her siblings went to live with her grandmother. Landin was

---

[5] Prior to conducting voir dire, Cortes moved to recuse the visiting judge from the case, contending he had made it difficult for him to represent his client; he seemed to be "trying to turn my client against me" and appeared to be biased in favor of the State. Although the judge denied the motion to recuse, the issue was rendered moot given his decision to have the presiding judge of the court conduct the trial.

3

her grandmother's husband but only lived with the family on the weekends. C.R. viewed Landin as her grandfather or a "father figure."

Landin first "touched" her when she was ten years old, and she described four incidents that all happened within the same approximate period of time. First, one morning when Landin was getting ready for work, he "slapped [her] rear" with an "open hand." Second, on another occasion, she had been lying on her bed on her stomach when Landin walked past her bedroom and again slapped her rear. Third, on yet another occasion, she had been sitting on Landin's lap as he was "bouncing" her and she could feel his penis. Fourth, one evening after her grandmother had gone to bed, she and Landin were alone on the couch watching television. Landin grabbed her hand, unzipped his pants, and placed her hand on his penis. As Landin held her wrist, he moved her hand "side to side." She "pulled away," and as she was walking to her bedroom, Landin told her not to tell her grandmother. These were the only incidents she recalled.

C.R. did not tell anyone about Landin's conduct until the evening of the incident on the couch. She told her grandmother that Landin had "touched" her or had made her touch him. When questioned, C.R. explained that Landin had briefly touched her inner thigh near her pelvis during their encounter on the couch but "pulled [] away on his own." She stated that this was the only time he had touched her thigh.

When C.R. reported the incident to her grandmother, her grandmother told Landin to leave the house but she did not call the police. Landin returned to the house the next week but did not touch her again after his return. Sometime later, when her older sister Annette was visiting, she told Annette that Landin had been touching her. Annette contacted the police and confronted her grandmother about the accusation. "Child services" interviewed her, and Annette then took her to see a doctor. C.R. declined to submit to a physical examination because she felt uncomfortable.

4

Although she could not recall how old she was at the time of her outcry to Annette, she testified that she was 11 years old when she left her grandmother's house a few months later to live with her uncle and his wife.

C.R. was still suffering from the emotional effects of Landin's actions, and "when everything came to light," she told a male teacher she did not want to return home. C.R. was crying when speaking with the teacher, and he patted her on the back, which caused her to feel uncomfortable. C.R. later reported the incident to her grandmother, who reported the incident to the "student council."

In an apparent attempt to discredit C.R., on cross-examination, Cortes asked C.R. about the report to the teacher as well as several other incidents from her past. Cortes asked whether she had reported that the teacher had touched her inappropriately, to which C.R. replied that she had never accused him of inappropriate touching. Cortes also asked C.R. if she had accused a boy at school of inappropriately touching her, but she also denied making any such accusation. Cortes then questioned C.R. about two separate incidents that occurred when she was five or six years old. First, he asked C.R. whether she had placed her brother's cat in an abandoned refrigerator in their grandmother's yard, which led to the cat's death or near-death. C.R. admitted to having done so, but explained it was because the cat was continually running away and she was trying to prevent him from getting lost when the family was leaving for a vacation. She explained that although she did not understand the consequences of her actions at the time given her young age, she now realized that what she did was wrong. Second, Cortes questioned C.R. about an incident in which she had called 911 to report that someone was in her house and that her entire family had been murdered, prompting the police to storm the house. C.R. admitted to making the call but explained that she did so after discussing making a "prank call" with a friend. Finally, Cortes questioned

C.R. about an incident on an undisclosed date in which she had been caught stealing items at a flea market and had initially lied about it. C.R. acknowledged having been caught stealing and that she would not have admitted to her actions but for the fact that she "got caught" with the items.

### (2) The testimony of C.R.'s sister

C.R.'s sister, Annette, testified at trial, without objection, that when visiting her grandmother in December 2017, she sensed something was wrong with C.R. Upon inquiry, C.R. informed Annette that Landin had been touching her. C.R. showed her one of the ways that Landin had touched her, but C.R. did not feel comfortable telling her all of the details and appeared "scared" reporting the incident. Annette called 911 and at the same time informed her grandmother of C.R.'s accusation. After speaking with the police, Annette took C.R. to the hospital for an examination.

On direct examination, the prosecutor asked Annette if she believed C.R.'s outcry. Without objection, Annette testified that she did. When asked why, Annette explained that it was a "serious" matter, and that, given her relationship with C.R., she could tell something was wrong. Annette said she knew when C.R. was lying, and C.R. never recanted her allegations or changed her story.

On cross-examination, Cortes asked Annette if she was aware of the incident in which C.R. placed the cat in the refrigerator. Annette asserted her belief that C.R. had done so to keep the cat from running away while the family was running an errand and that she forgot to get the cat out when they returned. Annette also responded in the negative when Cortes asked if she thought something was "off" with C.R. due to the 911 call she made at age five. Annette acknowledged, however, that she thought something was "off" when she learned of C.R. shoplifting at the flea market.

## (3) The testimony of SANE nurse Carmen Perusquia

Carmen Perusquia, a Sexual Assault Nurse Examiner (SANE nurse), testified as follows:

C.R.'s sister Annette brought C.R. to the hospital to be examined in December 2017 after her outcry. As part of her routine procedure, Perusquia obtained a "history" from C.R. for the purpose of medical treatment and assessment.[6] While speaking with C.R., Perusquia typed up her statements "verbatim," and her typed report was introduced in evidence at trial.

C.R. reported that Landin had touched her vagina over her underwear with his hand and fingers; touched her "butt" under her clothes; and put his mouth on her breast over her clothes. C.R. reported that the touching felt "weird" and that it happened more than once. C.R. told Perusquia that she did not initially report these incidents to anyone, as Landin had told her not to tell her grandmother and she was afraid he would stop buying her toys if she told.[7]

C.R. also told Perusquia about the incident on the couch in which Landin, who had his pants unzipped, grabbed her hand and made her touch his penis. C.R. told Perusquia that she informed her grandmother that Landin had been touching her vaginal area and making her touch him, but according to C.R., when her grandmother confronted him, Landin denied it, saying C.R. must have been "dreaming." Perusquia asked C.R. if anyone else had ever touched her vagina or forced her to touch someone's penis, and she replied in the negative.

On cross-examination, Cortes asked Perusquia whether it would have been "important" to know about the incident with the cat and the 911 call. Perusquia replied that it would not have been, as she was only seeing C.R. for sexual assault and it would not change her assessment of

---

[6] C.R. declined to have a physical examination, and pursuant to their policy, they did not force her to submit to an exam, noting that it was not necessary due to the length of time that had passed since the incident.

[7] On cross-examination, Cortes asked Perusquia if she believed C.R. was referring to the practice of "grooming" when she testified that Landin had been buying her toys. Cortes asked Perusquia if she found it "alarming" that a child of C.R.'s age would understand this practice. Perusquia replied that she did not find it alarming, as she believed C.R. was simply reporting her experiences.

C.R.'s credibility. Cortes asked Perusquia if she was aware of C.R.'s allegations of inappropriate touching against other individuals, but Perusquia again replied that these incidents would not have been important for her to know and would not have changed her assessment of C.R.'s credibility.

### (4) The testimony of forensic interviewer Samuel Abrego

Samuel Abrego testified as follows:

He conducted C.R.'s forensic interview at ChildSafe on January 17, 2018. Without objection, Abrego said that during the interview, C.R. made an outcry against Landin. C.R. described three incidents that occurred when she was 11 years old, providing specific "sensory" details and crying during the interview. He did not describe the nature of any of the incidents.

When asked on cross-examination if he thought it would be important to know that C.R. had made false accusations in the past and that she had "killed a family pet," he replied in the negative. He volunteered that it would be important to know if she had a disability or had made "conflicting statements" about the alleged abuse, but he observed that C.R. did not "recant" her accusations during the interview.

### (5) The testimony of Detective Bierman

Detective David Bierman testified as follows:

He was assigned to investigate C.R.'s allegations after Annette called the police, and he arranged for the forensic interview. During the interview, he is typically in a different room with a closed-circuit monitor to view but not be part of the interview. Although he could not recall if he was present for the entire interview, he later watched the entire interview on a DVD recording. Without objection, Bierman explained that during the interview, C.R. "described being sexually assaulted where her vaginal area was touched and then she was also made to touch the defendant's penis" and said "it had happened several times when she was nine . . . years of age." When asked

8

if he believed C.R.'s statements during the interview would be more reliable than statements she made later, he responded that "children's memories are difficult because sometimes they block out the trauma," but he believed that a child's memory would be better "closer to the incident, rather than six years later" when the case finally went to trial. He explained that her use of explicit terms, such as penis and vagina, during the interview impacted his view of her credibility.

Bierman addressed the additional investigative steps he took in C.R.'s case. Without objection, he stated that he had received a CPS investigator's report concluding there was "reason to believe" abuse had occurred. Bierman said such a finding meant the complainant "was being truthful and accurate in their description of what happened" and was "like a guilty verdict if they were some type of judicial body."[8]

Again, without objection, Bierman testified that C.R.'s grandmother had made statements to him that were "consistent with what we had heard already" and "mentioned that she may have suspected something." The grandmother reported asking the children if anybody had touched them, and she said C.R. indicated that Landin had been touching her.

Bierman also interviewed Landin, who he recalled voluntarily came to the police station, was aware of the allegations before he came in, and immediately denied any wrongdoing. After Bierman discussed the nature of the interview, the prosecutor asked if he "scheduled a follow-up" with Landin. Without objection, Bierman testified that he asked Landin to come back to take a polygraph examination, explaining:

> So we ask them (suspects) to take a polygraph at the end and [Landin] agreed because -- I was just trying to see if he could prove his innocence and the polygraph -- I have had a lot of success with it. I have been able to exonerate families that were being falsely accused of having sexual relations. So I was hoping he would come in and take that polygraph.

---

[8] Landin does not address the admissibility or accuracy of Bierman's testimony on this issue in his appeal.

The State then asked if the examination was ever conducted, and Bierman testified, without objection:

> It was not. He said he was going out of town. We said well, when you get back, call us. He explained to the other detective that used to work with us that he would be gone for an extended amount of time and he didn't know when he would be back. I thought that was kind of odd, so I just put down that he was not willing to take the exam and push the case forward.

Without objection, the State played the recorded interview with Landin, which included Bierman's request that Landin take a polygraph examination.

On cross-examination, Cortes asked Bierman if he had ever thought of ordering a polygraph for a victim to see if they were lying, and he said he would not be permitted to order one for a child under 16 years of age. The following colloquy ensued:

> Cortes:    You know a polygraph is not even admissible in this kind of thing, don't you? You know that, don't you?
>
> Bierman:   The polygraph is not.
>
> Cortes:    Do you know why? Because they're unreliable.
>
> Bierman:   Apparently you know. You're going to answer.
>
> Cortes:    I know you know that. Why don't you just say that: Because they are unreliable.

Cortes also asked Bierman on cross-examination if his opinion of C.R.'s credibility would be altered if he knew about the incidents with the cat and the 911 call. Bierman testified that neither incident would affect his opinion given how young C.R. was at the time. Cortes also asked if the fact that C.R. had been caught stealing items at the flea market affected his opinion of C.R.'s credibility, and he responded that it troubled him "[a] little bit." Bierman also acknowledged that although he was told C.R. may have made a report that she had been touched by one of her teachers and another child at her school, he did not investigate either claim.

10

### (6) C.R.'s statement regarding Landin's agreement to take a polygraph

Perusquia's report also contained a statement C.R. made expressing concern that another "lady" told her Landin had agreed to take a polygraph examination. According to the report, C.R. said: "I'm worried he's going to pass and then they are going to come back to me. He's going to say no to everything. All this is true, so he may not pass it." Before Perusquia testified, Cortes stated during a bench conference that he wanted to redact the reference to the polygraph examination and the State agreed to do so. However, shortly thereafter, Cortes informed the trial court that, "after thinking about it," he wanted to keep the reference to the polygraph in the record, pointing out that the jury was already aware that Landin had agreed to it based on Bierman's testimony and the video recording of the interview that was played for the jury. The State agreed to leave it in, and the trial court agreed as well, stating that it "[k]ind of shows that [C.R.'s] doubting herself that he's going to pass it." On cross-examination, Cortes asked Perusquia if she ever had "another incident like this where the child mentioned [] their concern about a polygraph test." Perusquia testified that she had not, but that she nevertheless did not find C.R.'s concern "alarming."

### (7) The testimony of C.R.'s guardian

Bernadette testified that she and her husband, C.R.'s uncle, became C.R.'s guardians sometime after C.R. made her outcry to Annette. Bernadette testified, without objection, that after C.R. came to live with them, C.R. told her that while living with her grandmother, Landin had done "indecent things with her" and had been "fondling" her "every once in a while." Specifically, C.R. told her that when she was ten years old, Landin had grabbed her "rear end," had made her touch his penis, had "press[ed] against her," and had C.R. sit on his lap and was "bringing her up and down." The prosecutor asked Bernadette if she believed C.R., and Bernadette stated that she

11

did, explaining she did not think C.R. could make up allegations of this nature and C.R. appeared uncomfortable and was "tearing up" when she described the incidents. According to Bernadette, C.R. was "consistent" in her reports and her story "did not change."

On cross-examination, Cortes asked Bernadette if she was aware of the incident with the cat, the 911 call, the accusation C.R. had allegedly made against her teacher, an accusation C.R. allegedly made about her grandmother touching her inappropriately, and that C.R. had stolen items at the flea market. Bernadette replied that she was aware of all of the incidents but for the accusation against C.R.'s grandmother. However, she testified that none of the incidents influenced her opinion about C.R.'s credibility, stating she knew C.R.'s "heart" and knew when she was telling the truth and when she was lying. On redirect she was asked, without objection, if she believed C.R. when she told her "what happened between her and the defendant," and Bernadette responded in the affirmative.

### (8) Defense witnesses

After the State rested, Cortes called C.R. as a defense witness. C.R. testified that she never accused her grandmother of "abusing" or "molesting her." Her grandmother, Landin's wife, was then called to rebut C.R.'s testimony. She reported that in 2015, two years prior to her outcry against Landin, C.R. had falsely accused her of inappropriate touching. According to the grandmother, after C.R.'s father was released from jail, he took C.R. for a visit and failed to return her. Because she had legal custody of C.R., she called the police and was later informed that both C.R. and her father had accused her of inappropriately touching C.R. After speaking with police, C.R. was returned to her. She testified that C.R. later informed her that she made the false accusation because she wanted to stay with her father.

12

On cross-examination, C.R.'s grandmother denied that C.R. made any specific accusations to her about Landin's actions, contending that C.R. only told her Landin had "touched" her. When asked why she did not report that outcry, she replied that she did not believe C.R. because she had falsely accused her of inappropriate touching in the past and C.R. had "lied so much it was one lie after another one."

She acknowledged, however, that C.R. never recanted the accusation against Landin about the inappropriate touching but contended C.R. had not been consistent in accusing Landin of touching her vagina. She further acknowledged that after C.R.'s outcry, she made the decision to give up custody to C.R.'s uncle and his wife in March 2018, but claimed she did so because she was "old" and they had threatened to get an attorney.

### C. Closing arguments

In closing, the State argued there was sufficient evidence, including C.R.'s own testimony, from which the jury could find Landin guilty of count one for forcing C.R. to touch his penis. The State, however, acknowledged that the evidence was less clear as to count two, in which Landin was accused of touching C.R.'s genitals, and that C.R. only testified that Landin had "[gone] up her leg and touched." The State further acknowledged that "some of her memories were hazy," as would be expected given that the incident happened more than six years ago. However, the State emphasized that the jury could look to Bierman's testimony regarding the statements C.R. made during her forensic interview with Abrego to the effect that Landin had "touched [her] there." The prosecutor also argued that Abrego provided similar testimony to the effect that C.R. told him Landin had "touched her in that area." Although Cortes did not object to this argument, the record reflects that Abrego only testified that C.R. described three incidents of abuse but did not specify

13

the nature of her descriptions. The State, however, did refer to the SANE nurse's testimony on this issue and the more detailed statement C.R. gave her.

In closing, Cortes argued the case turned on the "credibility of the witnesses" and it was the jury's "job" to make that determination. Cortes challenged C.R.'s credibility based primarily on the incident with the cat, likening her to a "serial killer" who starts out by "killing pets." He argued that when considered in conjunction with C.R.'s 911 prank call and the evidence that she had made allegedly false accusations against her grandmother, her teacher, and a fellow student, C.R. could be suffering from a serious mental illness and should not be considered credible. Cortes encouraged the jury to consider whether C.R. had made false accusations against her grandmother and Landin because she was unhappy living with her grandmother, pointing out that she testified she was happy now because she was no longer living there. As well, he argued C.R. was not credible because she gave "different versions" of Landin's abuse. Finally, Cortes criticized the police investigation, pointing out that Bierman admitted he did not investigate the allegations C.R. had made against her teacher and schoolmate.

### D. The verdict and sentencing

The jury found Landin guilty of both counts of indecency with a child by contact, as alleged in the indictment. The trial court held a short sentencing hearing that same day at which no witnesses were called. Cortes argued for a sentence of six to eight years on each conviction, to run concurrently, as Cortes had no criminal background other than some prior convictions—to which Cortes stipulated—that occurred when Landin was younger, which included a DWI on an undisclosed date, the delivery of LSD in 1974, and possession of marijuana in 1988. Although Cortes acknowledged that the current charges were "serious," he argued they were "isolated" in nature, and given Landin's age (68), the court should consider a short sentence or else "he might

14

not make it out of prison," likening a longer sentence to a "death sentence." The State argued for a longer sentence, contending Landin had been purposely "grooming" C.R. and "testing his limits" with "escalating" conduct, and but for C.R.'s sister's intervention, he likely would have engaged in even more serious conduct with her. The State also asked the court to consider the emotional impact his conduct had on C.R.

The judge sentenced C.R. to 16 years in prison on each count, with the sentences to run concurrently. In doing so, he pointed out that C.R. viewed Landin as a father figure, and given her young age and vulnerability, both he and C.R.'s grandmother had betrayed C.R.'s trust. The trial court entered judgments of conviction the next day, on August 24, 2023. Cortes filed a motion to withdraw as counsel on September 11, 2023, pointing out that although he was retained to represent Landin at trial, Landin was now indigent and eligible for an appointed attorney on appeal. Landin's current court-appointed appellate counsel filed a notice of appeal on September 19, 2024, but did not file a motion for new trial.

## II.  ISSUE ON APPEAL

In a single issue on appeal, Landin contends he was denied his right to effective assistance of counsel as Cortes failed to object to various hearsay statements from the witnesses pertaining to C.R.'s outcries; failed to object when various witnesses expressed their opinion of C.R.'s credibility and/or the truthfulness of her accusations; and, most glaringly, failed to object to the admission of evidence of Landin's failure to take the polygraph examination as he had agreed to do. The State counters that, because this issue is raised on direct appeal, even if Cortes failed to object to inadmissible evidence, the record is silent as to his trial strategy and we should presume he had a reasonable strategy for not objecting to the evidence in question. The State further

15

maintains that Landin has not satisfied his burden of establishing he was prejudiced by any deficiencies in Cortes's representation.

## III. STANDARD OF REVIEW AND APPLICABLE LAW

A criminal defendant has a right under the Sixth Amendment to the United States Constitution to be represented by effective, competent counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Ex parte Bryant*, 448 S.W.3d 29, 39 (Tex. Crim. App. 2014) (citing U.S. CONST. amend. VI). To prevail on a claim of ineffective assistance of counsel, a defendant must establish by a preponderance of evidence that (1) the attorney's performance was deficient, and (2) the deficient performance deprived him of a fair trial. *Strickland*, 466 U.S. at 687; *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005).

To demonstrate deficient performance, the defendant "must show that [the] attorney's performance 'fell below an objective standard of reasonableness . . . under prevailing professional norms' and according to the necessity of the case." *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011) (quoting *Strickland,* 466 U.S. at 687–88); *Ex parte Morrow*, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (en banc)). "Because there 'are countless ways to provide effective assistance in any given case,' a reviewing court must be highly deferential and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Ex Parte Martinez*, 330 S.W.3d 900 (quoting *Strickland*, 466 U.S. at 689).

Claims of ineffective assistance of counsel "must be firmly founded in the record to overcome this presumption." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). In general, trial counsel must be given an opportunity to explain his trial strategy before being

denounced as deficient. *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Thus, a direct appeal is usually an inadequate vehicle for raising an ineffective assistance of counsel claim because the record is generally undeveloped as to counsel's strategy. *Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *see also Thompson*, 9 S.W.3d at 814 n.5 ("The record in a direct appeal may well contain a less than adequate inquiry into possible tactical reasons for various actions or omissions by counsel and may lack completely trial counsel's own explanations for his actions or inactions."). Trial counsel "gets the benefit of the doubt from a silent record, and courts must assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Johnson v. State*, 624 S.W.3d 579, 585–86 (Tex. Crim. App. 2021) (citing *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)). Thus, in the face of a silent record, "the appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable." *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

Therefore, the better course of action is to pursue the claim in a motion for new trial or a post-conviction habeas proceeding at which the attorney is given the opportunity to explain his strategy. *See Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) (recognizing that "the record on direct appeal is in almost all cases inadequate to show that counsel's conduct fell below an objectively reasonable standard of performance and . . . the better course is to pursue the claim in habeas proceedings"); *Petrie v. State*, No. 06-07-00170-CR, 2008 WL 2986358, at *5 (Tex. App.—Texarkana Aug. 6, 2008, pet. ref'd) (mem. op., not designated for publication) (recognizing that the "best kind of record" for review of a claim of ineffective assistance of counsel is "one produced on a hearing on a motion for new trial or a hearing on an application for writ of habeas corpus"). The only exception for finding deficient performance in the face of a silent record are scenarios in which counsel's "conduct was so outrageous that no competent attorney would

17

have engaged in it." *Hart v. State*, 667 S.W.3d 774, 782 (Tex. Crim. App. 2023) (quoting *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013)). Otherwise, "we will assume a strategic motive if any can be imagined." *Rodriguez v. State*, No. 08-23-00121-CR, 2023 WL 6304870, at *3 (Tex. App.—El Paso Sept. 27, 2023, no pet.) (mem. op., not designated for publication) (citing *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005)).

If an appellant can establish deficient performance, he must then establish prejudice to successfully claim ineffective assistance of counsel. *See Lopez*, 343 S.W.3d at 142 (recognizing that unless a defendant can prove both prongs of the Strickland test, "an appellate court must not find Counsel's representation to be ineffective"). To prove prejudice, the defendant must establish that under the totality of circumstances, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex Parte Martinez*, 330 S.W.3d at 900–901 (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 694). "Prejudice requires a reviewing court to examine the totality of the evidence heard by the factfinder and determine whether the result of the proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *State v. Hradek*, 707 S.W.3d 384, 391 (Tex. Crim. App. 2024) (internal quotation marks omitted).

## IV. FAILURE TO OBJECT TO THE OUTCRY STATEMENTS ON HEARSAY GROUNDS

We first consider Landin's claim that Cortes was ineffective for failing to object to the various witnesses who testified regarding C.R.'s outcries, contending that their testimony constituted inadmissible hearsay. The State does not deny that Cortes "repeatedly did not" object

to the "alleged hearsay" testimony of various witnesses, but it maintains Cortes may have had a reasonable trial strategy for not objecting.

### A. Applicable law

To demonstrate counsel's performance was deficient for failing to object to evidence on hearsay grounds, Landin must "show that the trial court would have committed error in overruling [his] objection[s]." *Ex parte Skelton*, 434 S.W.3d 709, 718 (Tex. App.—San Antonio 2014, pet. ref'd) (citing *Ex parte Martinez*, 330 S.W.3d at 901). Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay is not admissible except as provided by statute or [the Rules of Evidence] or by other rules prescribed pursuant to statutory authority. Tex. R. Evid. 802. We consider the testimony of the various witnesses regarding C.R.'s outcries to determine whether the trial court would have erred in overruling hearsay objections had Cortes made them.

### B. The SANE nurse's testimony

As set forth above, Perusquia, the SANE nurse who examined C.R. in December 2017 testified at trial that C.R. told her Landin had touched her vagina over her underwear with his hand and fingers, touched her "butt" under her clothes, put his mouth on her breast over her clothes, and forced her to touch his penis with her hand. Cortes did not object to her testimony, but the record does not support a conclusion that any such objection would have been sustained.

In general, courts have recognized that statements made by a sexual assault victim to a SANE nurse during an exam may come under the exception to the hearsay rule in Rule 803 of the Texas Rules of Evidence for statements made to a medical professional for the purpose of medical diagnosis or treatment, and which, among other things, describe the victim's medical history, her

19

symptoms, or their causes.[9] *See Kirkman v. State*, No. 01-18-00978-CR, 2020 WL 2026372, at *3 (Tex. App.—Houston [1st Dist.] Apr. 28, 2020, pet. ref'd) (mem. op., not designated for publication) (recognizing that "Texas courts have repeatedly held that statements made by child sexual assault victims during [SANE] examinations related to those assaults are admissible under [Texas Rule of Evidence] 803(4) [as a statement made for medical diagnosis or treatment]"); *see also Little v. State*, No. 04-08-00723-CR, 2009 WL 2882932, at *2 (Tex. App.—San Antonio 2009, no pet.) (mem. op., not designated for publication) (holding admission of SANE report was not an abuse of discretion where the report was admissible under Rule 803).

Excepting such statements from the hearsay rule stems from the fact that seeking treatment for health issues carries with it a "self-interested motive" to facilitate treatment, and therefore is sufficiently reliable to be admissible at trial. *Taylor v. State*, 268 S.W.3d 571, 588 (Tex. Crim. App. 2008). It is often necessary for a young child to identify her abuser as well as the nature of her abuse to a medical professional to reveal the "extent of the child's 'emotional and psychological injuries'—particularly when the perpetrator might be a family or household member and it is important to remove the child from the abusive environment." *Id*. at 591. A court may infer from the record that a victim of a sexual assault would know it was important to tell a SANE nurse the truth in order to obtain medical treatment or diagnosis. *Lumsden v. State*, 564 S.W.3d 858, 884 (Tex. App.—Fort Worth 2018, pet. ref'd) (court could infer from the record that child-victim of sexual assault "knew it was important to tell a [SANE nurse] the truth in order to obtain medical treatment or diagnosis"); *Juarez v. State*, No. 04-15-00413-CR, 2016 WL 1359372, at *7 (Tex. App.—San Antonio Apr. 6, 2016, no pet.) (recognizing same).

---

[9] Rule 803 provides that an out-of-court statement is excepted from the rule against hearsay when it "is made for--and is reasonably pertinent to--medical diagnosis or treatment; and [it] describes medical history; past or present symptoms or sensations; their inception; or their general cause." Tex. R. Evid. 803(4).

Here, Perusquia testified that C.R. made her outcry statements while she was obtaining a history from C.R. for the purpose of medical treatment and assessment. In particular, she explained that the purpose of her exam was to obtain a history from C.R. to let her know what kind of exam or testing she needed, whether C.R. needed follow-up care, including counseling, and what steps might be needed to protect her safety upon discharge. The record therefore demonstrates that the trial court would not have abused its discretion in admitting her testimony as an exception to the hearsay rule over an objection Cortes might have made. Accordingly, we cannot say that counsel was ineffective for failing to object to Perusquia's testimony at trial. *See Duckworth v. State*, No. 04-12-00077-CR, 2013 WL 3871058, at *1–3 (Tex. App.—San Antonio July 24, 2013, no pet.) (mem. op., not designated for publication) (concluding that trial counsel was not deficient in failing to object to SANE nurse's testimony regarding statements made to her by child-victim of sexual assault, where the statements came under the exception to the hearsay rule).

## C.   Remaining outcry statements

The question of whether Cortes was ineffective for failing to object to the testimony of other witnesses who testified at trial to C.R.'s outcries poses a more complex issue. The Rules of Evidence provide for an exception to the hearsay rule for the testimony of "outcry" witnesses, defined as the first person 18 years of age or older other than the defendant to whom a child-victim of physical or sexual abuse made a statement describing certain enumerated offenses, including indecency with a child by sexual contact. Tex. Code Crim. Proc. Ann. art. 38.072 §§ 1, 2(a); *see also Martinez v. State*, 178 S.W.3d 806, 810–11 (Tex. Crim. App. 2005) (recognizing that "[b]ecause it is often traumatic for children to testify in a courtroom setting, especially about sexual offenses committed against them, the Legislature enacted Article 38.072 to admit the testimony of the first adult a child confides in regarding the abuse").

21

However, this exception has "additional requirements that must be met before an outcry witness may testify." *Sanchez v. State*, 354 S.W.3d 476, 484–85 (Tex. Crim. App. 2011). Prior to the admission of outcry testimony, the State must notify the defendant of its intention to call an outcry witness, and it must identify the witness and provide a "summary of the outcry statement that will be offered[.]" *Id.* (citing Tex. Code Crim. Proc. Ann. art. 38.072 § 2(b)(1)). Then, outside the presence of the jury, the trial court must hold a hearing to determine whether "based on the time, content, and circumstances of the statement . . . the victim's out-of-court statement is 'reliable.'" *Id.* (citing Tex. Code Crim. Proc. Ann. art. 38.072 § 2(b)(2)). "The statement must be 'more than words which give a general allusion that something in the area of child abuse is going on'; it must be made in some discernable manner and is event-specific rather than person-specific." *Lopez*, 343 S.W.3d at 140 (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990) (en banc)); *see also Marquez v. State*, 165 S.W.3d 741, 746 (Tex. App.—San Antonio 2005, pet. ref'd) (recognizing same).

There may be more than one outcry witness if the complainant outcried about different events to different witnesses. *See McCormick v. State*, No. 08-18-00073-CR, 2021 WL 4398418, at *9 (Tex. App.—El Paso Sept. 27, 2021, pet. ref'd) (not designated for publication) (recognizing that "[o]utcry statements from multiple witnesses may be admissible under the statute if each witness testifies about different incidents of abuse") (citing *Lopez*, 343 S.W.3d at 140 (recognizing that "[t]here may be only one outcry witness per event")). However, if the witnesses all testify that the child victim outcried to the same event or events, it is error to allow "multiple witnesses to testify to those [outcry] statements." *Gibson v. State*, 595 S.W.3d 321, 326–27 (Tex. App.—Austin 2020, no pet.) (citing *Brown v. State*, 189 S.W.3d 382, 387 (Tex. App.—Texarkana 2006, pet. ref'd)); *see also Rodriguez v. State*, 689 S.W.3d 386, 392 (Tex. App.—Corpus Christi 2024, pet.

ref'd) (recognizing that "[t]he testimony of a second outcry witness is not admissible . . . when the witness merely provides additional details regarding the same instance of sexual abuse"); *Crawford v. State*, No. 01-22-00706-CR, 2024 WL 3056648, at *7 (Tex. App.—Houston [1st Dist.] June 20, 2024, pet. ref'd) (mem. op., not designated for publication) (finding trial court erred by admitting testimony of two outcry witnesses testifying to the same events).

Here, nothing in the record indicates that the State followed the proper notification procedures under Article 38.072 prior to introducing the various witnesses who testified to C.R.'s outcries. Nor is there any indication that the trial court held a hearing to determine which of the various witnesses to whom C.R. reported her accusations against Landin could properly testify as outcry witnesses. Yet, without objection, several witnesses testified at trial to C.R.'s various outcries against Landin. C.R.'s grandmother testified that when C.R. made her first outcry, she only told her that Landin had "touched" her but did not provide any specific details. C.R. herself testified somewhat equivocally that she told her grandmother about the incident on the couch immediately after it happened but was unclear as to whether she said Landin had touched her or made her touch him. Complicating matters, C.R. did unequivocally tell the SANE nurse that she had told her grandmother Landin had been touching her vaginal area and was making her touch him. In addition, Annette testified at trial that C.R. told her Landin had touched her but did not provide any details of the touching.

Regardless of whether C.R.'s grandmother, Annette, or the SANE nurse, all of whom heard C.R.'s outcries in December 2017, could be considered proper outcry witnesses, three additional witnesses were permitted to testify to outcry statements C.R. made after her initial outcries, all without objection from Cortes. First, Abrego testified that during his forensic interview with C.R.,

she made an "outcry" against Landin.[10] Second, Bernadette testified that months later, C.R. told her Landin had "fondled" her, done "indecent things with her," grabbed her "rear end," made her touch his penis, "press[ed] against her," and had C.R. sit on his lap, "bringing her up and down." Third, Bierman testified to the statements he heard C.R. make during her recorded interview with Abrego in January 2018 in which C.R. "described being sexually assaulted where her vaginal area was touched and then she was also made to touch the defendant's penis." Similarly, Bierman testified, again without objection, that C.R.'s grandmother, whom he believed was the proper outcry witness under Texas law (even though she was not designated as such) had made statements to him during the initial phase of his investigation that were "consistent" with what they had already heard; that C.R.'s grandmother "mentioned that she may have suspected something"; and that C.R. had informed her that Landin had been touching her. Texas courts have consistently rejected attempts to introduce an outcry statement by methods other than the live testimony of the outcry witness. *See McCormick*, 2021 WL 4398418, at *9 (recognizing that "[e]vidence admitted under Article 38.072 is restricted to the live testimony of a properly designated outcry witness").

While the State does not argue whether these statements were admissible, it maintains that Cortes may have had a reasonable trial strategy for allowing in the statements, namely, to point out that C.R.'s statements were inconsistent and challenge her credibility. In support of this argument, the State relies on the San Antonio Court of Appeals' holding in *Vega v. State*, 610 S.W.3d 79 (Tex. App.—San Antonio 2020, no pet.). In *Vega*, defense counsel failed to object to the testimony of five witnesses who described out-of-court statements that a child complainant

---

[10] We recognize that a forensic investigator may be deemed an outcry witness, but only if he or she is in fact the first person to whom a discernable outcry is made about a particular event. *See, e.g.*, *Petrie v. State*, No. 06-07-00170-CR, 2008 WL 2986358, at *3 (Tex. App.—Texarkana Aug. 6, 2008, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that the forensic interviewer was a proper outcry witness where child-victim had made a detailed outcry of abuse to her father first).

made to them, including the child's mother, a CPS investigator, two other CPS caseworkers, and the child's therapist. *Id*. at 82. As here, the issue of ineffectiveness of counsel was not raised in a motion for new trial; instead, the defendant's appellate counsel raised the issue on direct appeal. *Id.* at 83. Although the record was silent regarding trial counsel's strategy for not objecting, the State posited the theory that trial counsel's strategy was to impeach the child's testimony, as he argued that her "story was less than credible because it changed each time she recounted the incident to the various outcry witnesses." *Id*. at 83–84; *Lopez*, 343 S.W.3d at 143–44 (refusing to find that trial counsel's performance was defective on silent record where trial counsel failed to object to three witnesses who testified to a child-victim's outcry statements pertaining to the same events, where the State posited that he may have done so "in order to expose inconsistencies in her outcries, thereby challenging her truthfulness"); *Prestiano v. State*, 581 S.W.3d 935, 948 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (finding, based on silent record, that it was "conceivable that [appellant's] trial lawyer made a strategic decision to refrain from objecting to [the child-victim's therapist's] hearsay testimony about the child's statements, and the corresponding exhibits, to reveal any inconsistencies in the child's account of the sexual abuse"); *see also Hankey v. State*, 231 S.W.3d 54, 59 (Tex. App.—Texarkana 2007, no pet.) (finding that trial counsel's failure to object to testimony from the child-victim's mother regarding the child's out-of-court statements and a videorecording of a forensic interview, both of which constituted inadmissible hearsay, could be explained by counsel's strategy of impeaching the child victim's credibility where counsel pointed out "some contradictions" in her stories in closing argument).

Cortes made a similar argument to the jury in closing that C.R. was not credible because she gave "different versions" of what occurred, pointing out that she claimed at various times that Landin had touched her vagina and had touched her breasts with his mouth, while at other times

failing to include those accusations. Cortes relied on the inconsistencies when cross-examining Bierman, asking him whether he believed providing "these different versions . . . affect[ed] credibility," to which Bierman replied, "they can affect it."

Accordingly, while we cannot say that this was in fact Cortes's strategy for failing to object to the hearsay testimony at issue based on the silent record before us, we also cannot say that Cortes lacked a reasonable trial strategy for failing to object to the admission of C.R.'s out-of-court statements, or that not objecting to the hearsay statements was so "outrageous" that no competent attorney would have engaged in it.

### D. The failure to object to improper opinion testimony

Landin also argues that Cortes's representation was deficient based on his failure to object when the prosecutor asked at least two of the State's witnesses whether they believed C.R. had been truthful in her accusations and whether Landin had been truthful in denying the allegations.

Rule 701 of the Texas Rules of Evidence governs opinion testimony of lay witnesses and provides that such testimony is limited to an opinion that is: "(a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." Tex. R. Evid. 701. "The initial requirement that an opinion be rationally based on the perceptions of the witness is itself composed of two parts. First, the witness must establish personal knowledge of the events from which his opinion is drawn and, second, the opinion drawn must be rationally based on that knowledge." *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997) (en banc). "Perceptions refer to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (i.e., things the witness saw, heard, smelled, touched, felt, or tasted)." *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002) (citing *Fairow*, 943 S.W.2d at 898) (recognizing that "[t]he perception requirement of Rule

26

701 is consistent with the personal knowledge requirement of Rule 602"). Thus, a witness's testimony "can include opinions, beliefs, or inferences as long as they are drawn from his or her own experiences or observations." *Id.*

However, "it is generally improper for [the] witness to offer a direct opinion as to the truthfulness of another witness," as it is within the sole province of the jury to determine a witness's credibility. *See Arzaga v. State*, 86 S.W.3d 767, 776 (Tex. App.—El Paso 2002, no pet.) (citing *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997); *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993) (en banc)); *Fisher v. State*, 121 S.W.3d 38, 41 (Tex. App.—San Antonio 2003, pet. ref'd) (recognizing same); *see also Cantu v. State*, No. 08-12-00348-CR, 2015 WL 400454, at *2 (Tex. App.—El Paso Jan. 30, 2015, pet. ref'd) (not designated for publication) (recognizing that this rule applies to expert and lay witness testimony alike, as "both lay and expert opinions as to the truthfulness of another witness invade the province of the jury and are inadmissible"). As our sister court has explained, the Texas Code of Criminal Procedure provides that the jury is the exclusive judge of the facts, and therefore, "the jury alone decides whom to believe and what weight to give the evidence." *See Elmawla v. State*, No. 02-19-00279-CR, 2021 WL 1421437, at *3 (Tex. App.—Fort Worth Apr. 15, 2021, pet. ref'd) (mem. op., not designated for publication) (citing Tex. Code Crim. Proc. Ann. art. 38.04). Accordingly, testimony as to the truthfulness of another witness "is inadmissible because it does more than assist the trier of fact to understand the evidence or to determine a fact in issue; it impermissibly decides an issue for the jury." *Arzaga*, 86 S.W.3d at 776; *Yount*, 872 S.W.2d at 709.

Cortes allowed two witnesses—Annette and Bernadette—to respond to the prosecutor's questions on direct examination asking whether they believed C.R. when she reported her

accusations to them. Both, without objection, responded that they believed her and why. The State did not provide any argument for the admission of this opinion testimony.

The State assumes for purposes of appeal that the challenged "opinion" testimony was inadmissible but argues Cortes may have had a reasonable trial strategy for not objecting to the testimony, contending he may not have objected as he did not want to draw attention to the testimony. *See Garcia v. State*, No. 04-12-00012-CR, 2013 WL 1149288, at *7 (Tex. App.—San Antonio Mar. 20, 2013, no pet.) (mem. op., not designated for publication) (recognizing that trial counsel may have had a reasonable trial strategy for failing to object when detective testified that he believed the child-victim was being truthful—to avoid drawing undue attention to his testimony). In addition, the State posits that Cortes may have decided to forego objections to this testimony, as it opened the door to allow him to vigorously cross-examine the witnesses to determine if their opinions regarding the truthfulness of C.R.'s outcry would change if they knew C.R. had engaged in the acts described above. In turn, the State contends that this allowed Cortes to paint C.R. as a "liar," and a potentially ill person, if not a potential "serial killer" in closing argument.

Once again, although we cannot say that this was in fact Cortes's strategy, we also cannot say on the silent record before us that Cortes's failure to object to the opinion testimony was so outrageous that no competent attorney would have engaged in it.[11]

### E. The polygraph evidence

Finally, Landin contends Cortes was ineffective for failing to object when Bierman testified that he asked Landin if he would take a polygraph examination as a means of potentially proving

---

[11] Landin does not specifically address Bierman's opinion testimony about whether Landin was lying. Accordingly, we do not consider it in determining whether Landin can meet his burden of establishing that Cortes's representation was ineffective.

his innocence and Landin agreed to do so then failed to return to take the examination, which Bierman interpreted as "not [being] willing to take the exam."

It is well-established that in Texas, "the results of or references to a polygraph examination are inadmissible for all purposes." *Martinez v. State*, 272 S.W.3d 615, 626 (Tex. Crim. App. 2008) (internal quotation marks omitted). "The two primary reasons for excluding polygraph evidence are: (1) the inherent unreliability of polygraphs; and (2) the tendency of the results to be unduly persuasive to the fact finder." *Martinez v. State*, No. 08-14-00242-CR, 2018 WL 2328242, at \*2 (Tex. App.—El Paso May 23, 2018, pet. ref'd) (not designated for publication) (citing *Martines v. State*, 371 S.W.3d 232, 250 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Ex parte Bryant*, 448 S.W.3d 29, 40 (Tex. Crim. App. 2014) (recognizing that "[p]olygraph evidence is generally excluded from courtrooms because the reliability of such tests remains unproven and jurors could attach undue credibility to a test that purports to sort truth from fiction, a role for which a factfinder is more properly suited") (citing *Leonard v. State*, 385 S.W.3d 570, 577–81, 583 (Tex. Crim. App. 2012)).

As we have previously recognized, regardless of whether the case involves an actual polygraph test or the nonperformance of a polygraph test, the potential harm is the same: namely, the jury will speculate about the results (or non-results) or a witness's (or a defendant's) testimony (or position) will be bolstered. *Martinez*, 2018 WL 2328242, at \*2 (citing *Ex Parte Huddlestun*, 505 S.W.3d 646, 664 (Tex. App.—Texarkana 2016, pet. ref'd) (concluding that evidence regarding officer's failure to request a polygraph examination from defendant was inadmissible as it would have caused the jury to speculate about the results of a "nonperform[ed] polygraph examination"); s*ee also White v. State*, No. 03-17-00504-CR, 2019 WL 2518755, at \*3–10 (Tex. App.—Austin June 19, 2019, no pet.) (evidence of a defendant's willingness to take a

polygraph examination is inadmissible as it may cause the factfinder to "speculate about its outcome" and the "defendant's position will be bolstered").

Thus, in addition to prohibiting evidence of the results of a polygraph examination, Texas courts have held that evidence that a defendant was offered a polygraph examination but refused to submit to one is also inadmissible at trial. *See Kugler v. State*, 902 S.W.2d 594, 595 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (reversing and remanding for a new trial where detective testified at trial that appellant had been offered a polygraph but refused to submit to one, finding that the testimony was "unduly persuasive and cannot be cured by an instruction to disregard"); *Frueboes v. State*, No. 06-03-00061-CR, 2004 WL 625682, at *3 (Tex. App.— Texarkana Mar. 31, 2004, no pet.) (mem. op., not designated for publication) (recognizing that "if a witness testifies that a defendant refused to take a polygraph test and that testimony is deemed unduly persuasive, a mistrial may be required"); *Fry v. State*, No. 11-03-00002-CR, 2004 WL 42570, at *2 (Tex. App.—Eastland Jan. 8, 2004, no pet.) (not designated for publication) (recognizing that "[w]hen a witness testifies that a defendant refused to take a polygraph test, the trial court may be required to grant a mistrial"); *Perez v. State*, No. 01-99-00911-CR, 2003 WL 1849222, at *5 (Tex. App.—Houston [1st Dist.] Apr. 10, 2003, pet. ref'd) (recognizing that "the results of polygraph examinations are inadmissible and that admission, over objection, of testimony of a defendant's refusal to take a polygraph has been held to be reversible error").

In the context of ineffective-assistance-of counsel cases, the Court of Criminal Appeals has held that although counsel's failure to object to the admission of polygraph evidence is not "deficient as a matter of law," the failure to object "almost always falls below an objective standard of reasonableness because most attorneys will have no reasonable strategy in allowing the introduction of such evidence." *Ex parte Bryant*, 448 S.W.3d at 40. However, the court cautioned

that appellate courts "cannot categorically exclude the possibility that a trial attorney, under certain circumstances, could use the admission of polygraph evidence to his client's favor." *Id.* And in the face of a silent record as to Cortes's strategy for failing to object to Bierman's testimony regarding the polygraph, we must tread lightly in determining whether his failure to object could be considered so outrageous that no competent counsel would have engaged in such conduct.

In a similar situation, defense counsel failed to object at trial when a detective was permitted to testify that the defendant initially agreed to take a polygraph examination but later chose not to submit to the examination because his lawyer advised him against it. *White v. State*, No. 03-17-00504-CR, 2019 WL 2518755, at *6 (Tex. App.—Austin June 19, 2019, no pet.) (mem. op., not designated for publication). On direct appeal, the defendant argued that his counsel was ineffective for failing to object to the testimony. *Id*. The court, however, pointed out that the introduction of polygraph evidence does not constitute deficient performance as a matter of law and that an appellate court must consider whether there could be a reasonable trial strategy for failing to object. *Id*. (citing *Bryant*, 448 S.W.3d at 40). Because the defendant was raising his claim on direct appeal and trial counsel had not been given the opportunity to explain his reasons for not objecting, the court was unwilling to say that "no reasonable trial strategy could justify" or explain his decision or that his conduct was "so outrageous that no competent attorney would have engaged in it." *Id*. at *7. It therefore concluded that the appellant had failed to rebut the presumption that trial counsel's decision was in some way "reasonable." *Id*.; *see also Rodriguez v. State*, No. 08-23-00121-CR, 2023 WL 6304870, at *3 (Tex. App.—El Paso Sept. 27, 2023, no pet.) (mem. op., not designated for publication) (concluding that because appellant raised his claim of ineffective-assistance-of-counsel on direct appeal, and the record was therefore silent as to why trial counsel failed to object to the introduction of testimony regarding appellant's refusal to take a polygraph

31

examination, appellant was unable to overcome the presumption that he received reasonable assistance of counsel).

In Landin's case, the State posits that Cortes may have failed to object to Bierman's testimony regarding Landin's failure to take the polygraph examination because Cortes believed a better strategy was to cross-examine the detective regarding the unreliability and inadmissibility of such tests. In addition, the State contends that failing to object to Bierman's polygraph testimony opened the door to allowing evidence of C.R.'s statement to the SANE nurse expressing concern that Landin had agreed to take a polygraph examination and that he might pass the exam, thereby raising doubts as to her credibility.

Regardless of whether this was in fact Cortes's trial strategy, we cannot say on this undeveloped record that there was not a reasonable trial strategy for his failure to object to the polygraph evidence. Nor can we say that Cortes's failure to object was so outrageous that no competent attorney would have engaged in similar conduct. Landin's sole issue on appeal is overruled.

## V. CONCLUSION

On the record before us, Landin has not met his burden of establishing that Cortes's conduct was deficient under the first prong of the *Strickland* test. We therefore do not reach the second prong requiring a showing of prejudice.[12] *See Lopez*, 343 S.W.3d at 143–44 (where appellant

---

[12] In resolving this appeal, we are only concluding that given the silent and undeveloped record before us, Landin did not meet his burden of establishing that Cortes's performance was deficient. Our opinion does not foreclose raising a claim of ineffective assistance of counsel in a post-conviction habeas proceeding where a proper record could be developed regarding Cortes's trial strategy. *See Thompson v. State*, 9 S.W.3d 808, 814–15 (Tex. Crim. App. 1999) (recognizing that the general doctrine that forbids an application for writ of habeas corpus after direct appeal does not apply in a situation in which a defendant has raised a claim of ineffective assistance of counsel on direct appeal, and an appellant can therefore "resubmit his claim via an application for writ of habeas corpus") (citing *Oldham v. State*, 977 S.W.2d 354, 363 (Tex. Crim. App.1998); *Ex Parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997)).

failed to meet his burden of establishing deficiency under the first prong of *Strickland*, court need not address whether he met his burden of establishing the second prong).

Accordingly, we affirm the trial court's judgment of conviction.

LISA J. SOTO, Justice

April 30, 2025

Before Salas Mendoza, C.J. Palafox and Soto, JJ.

(Do Not Publish)